Robert P. McDONALD, Plaintiff,

v.

STATE OF KANSAS, DEPARTMENT
OF CORRECTIONS, and its
representatives, Defendant.

Civ. A. No. 94–2192–KHV.

United States District Court,
D. Kansas.

Feb. 2, 1995.

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for plaintiff.

Lisa A. Mendoza, Kansas Dept. of Corrections, Edward F. Britton, Jr., State of Kansas, Topeka, KS, for defendant.

**1418**

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Robert P. McDonald, a former correctional officer at the Lansing Correctional Officer (formerly the Kansas State Penitentiary in Lansing, Kansas), alleges that the Kansas Department of Corrections subjected him to harassment and inequal treatment in the terms and conditions of his employment, and later terminated his employment, on account of his disability or perceived disability. Plaintiff claims that defendant thus violated the Americans With Disabilities Act [ADA], 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and the Kansas Act Against Discrimination [KAAD], K.S.A. § 44–1001 *et seq.* In addition, plaintiff brings pendent state law claims for negligent and intentional infliction of emotional distress.

This matter comes before the Court on defendant's *Motion for Summary Judgment* (Doc. # 32) filed December 7, 1994. Having considered the entire record in this case, for reasons stated more specifically below, the Court finds that said motion should be and hereby is sustained.

### Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who fails to make a showing to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 893 (10th Cir.1994). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party properly supports its motion, the nonmoving party may not rest upon mere allegation or denials of his or her pleadings, "but must set forth specific facts showing that there is a genuine issue for trial...." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Thrasher v. B & B Chem. Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### Undisputed Facts

Effective January 9, 1989, the Kansas Department of Corrections employed plaintiff as a Correctional Officer I at the Lansing Correctional Facility (LCF), formerly the Kansas State Penitentiary in Lansing, Kansas. LCF is a maximum security adult correctional institution and under Kansas law, correctional officers are law enforcement officers as defined in K.S.A. § 22–2202(13) and K.S.A. § 75–5247a. In performing their jobs, correctional officers are required to supervise convicted felons, provide prompt response to accidents and emergencies and backup to other correctional officers, and

react physically in confrontational situations within the prison setting.

On October 18, 1989, plaintiff received a promotion to the position of Correctional Officer II. His duties in that position included responsibility for protection of life, enforcement of administrative regulations, patrol and surveillance in the prison facility, and response to emergencies. Plaintiff's duties also involved an element of personal danger from combative felons and, indeed, plaintiff on one occasion was attacked by an inmate. Plaintiff understood that the physical requirements of his position included running, going up stairs, chasing inmates, physically subduing inmates, and standing for unknown periods of time. On a rotating basis, correctional officers manned certain posts within the prison (such as the gun towers and the main gate) which did not "ordinarily" subject them to the possibility of attack or physical contact with inmates. Nonetheless, plaintiff's position included the foreseeable risk of injury to himself and others. Working conditions at LCF included the threat of assault, murder, escape, fire, riots and other disturbances which could result in injury or death of correctional officers, other institutional employees and visitors, and damage to state property. The degree of risk varied to some extent from post to post within the prison, but the record is undisputed that correctional officers have been killed by inmates at LCF.

At the time plaintiff began his employment in January, 1989, he weighed approximately 400 lbs. His weight prompted the Department of Corrections to grant him various accommodations, including specially ordered uniforms, a specially ordered reinforced chair, temporary light duty, and acquiescence in plaintiff's use of a modified shake-down procedure for searching inmates.

In the fall of 1991, a review of plaintiff's time and attendance records indicated an excessive use of sick leave which, if continued, would leave plaintiff without significant sick leave when he needed it. Therefore, on November 7, 1991, pursuant to Kansas Administrative Regulations, Warden David McKune directed plaintiff to provide a physi-

cian's statement each time he requested sick leave for any reason.[1]

On May 22, 1992, plaintiff gave defendant a medical excuse which stated that he had been under a doctor's care for congestive heart failure, but would be able to return to work beginning April 29, 1992. According to the excuse, however, plaintiff was medically restricted to light duty, *i.e.* no walking more than 100 feet, no standing for more than 15 minutes, no lifting of any object that could not be lifted with one hand, no bending or squatting, and no steps.

In response to these restrictions, Warden McKune on June 1, 1992, advised plaintiff that while he had been temporarily assigned to a limited duty post, LCF was unable to accommodate such restrictions on a permanent basis. Moreover, because the physician's excuse had indicated that plaintiff might be at least temporarily unable to perform his full range of job duties, Warden McKune asked that plaintiff's physician by June 12, 1992, provide an evaluation of "when [he] might be able to perform the full range of Corrections Officer II duties, which involve control of inmates."

On June 22, 1992, Warden McKune received the following response from Dr. Schwegler:

> Dear Sirs:
>
> This letter is in response to Mr. McDonald's request for a statement of his health as it corresponds to a personnel position description, apparently from the Lansing Correctional Facility—400. In my opinion Mr. McDonald's health for the present and at least foreseeable future is in conflict with the section labeled part three under special knowledge skills and abilities. In my opinion Mr. McDonald would not be able to comply with the sentence as stated, ability to stand for long periods, respond quickly to emergencies, and use force to subdue violent inmates. At the present time it is not possible for me to determine how long Mr. McDonald will be unable to carry out this level of responsibility.

---

1. K.S.R. § 1–9–5(d) provides that any employee may be required by the appointing authority to provide evidence necessary to establish entitlement to sick leave.

Upon reviewing Dr. Schwegler's letter, Warden McKune by letter dated June 25, 1992, again advised plaintiff that LCF was able to accommodate plaintiff's restrictions on a temporary basis, but that a permanent accommodation was not possible.[2] Warden McKune agreed to continue plaintiff on limited duty for 60 days, after which time he would reevaluate plaintiff's ability to perform his job and determine whether to terminate his employment without prejudice until such time as plaintiff was able to assume the full duties of his position.

Plaintiff apparently did not respond to the Warden's letter or otherwise provide evidence of any change in medical status. Therefore, by letter dated September 2, 1992, Warden McKune advised plaintiff that he intended to "separate [him] without prejudice from [his] position as a Corrections Officer II at the Lansing Correctional Facility effective close of business Friday, September 4, 1992." Warden McKune stated that the proposed action, pursuant to K.S.A. § 75-2949e(a)(1), was necessary because of plaintiff's inability to perform the duties of his position.[3] Warden McKune stipulated that the separation would be non-disciplinary and without prejudice, and gave plaintiff an opportunity to respond in writing or in person, or to meet personally with the Warden, either alone or with a representative of his choosing. Under this procedure, plaintiff would depart in good standing and be eligible for rehire.

Plaintiff accepted Warden McKune's invitation for a face-to-face meeting[4] and on September 9, 1992, plaintiff and his union representative, Joe Krumm, met with Warden McKune to discuss the proposed dismissal.[5] At the meeting, plaintiff did not disclose that he had a current heart problem, and neither he nor Krumm made any request for accommodation concerning plaintiff's medical restrictions. Plaintiff merely told Warden McKune that "[he] felt like [he] still was capable of contributing to the institution's wellbeing, that [he] wanted to do whatever [he] could, basically, along those lines." As a result of that meeting, Warden McKune granted plaintiff an additional two months in which to see a doctor to determine whether he could return to full duty. Moreover, the Warden agreed not to make any decision concerning plaintiff's employment for 60 days, or until he received further advice concerning plaintiff's medical condition. Warden McKune directed plaintiff to provide a statement from his physician, on or before November 9, 1992, indicating his ability to perform the essential functions of his job.

On September 28, 1992, Warden McKune received the following letter from Geoffrey L. Harms, M.D., Chief of Cardiology at Humana Hospital in Overland Park, Kansas:

> Dear Sir:
>
> Mr. McDonald asked me to convey to you my cardiologic opinion. He has evidence of coronary artery disease with antecedent myocardial infarction and significant left ventricular dysfunction. This is in addi-

---

**2.** The policy and practice of the Kansas Department of Corrections is to provide "temporary and long-term (not permanent) light duty assignments for uniformed staff who receive a physician's release for duty under certain restrictions." According to the policy, this arrangement allowed defendant to schedule "every available employee" during times of staff shortage while fostering "a great deal of cooperation and understanding from healthy staff members who are temporarily displaced."

Plaintiff understood that this policy was to allow employees to recover from *temporary* illnesses or injuries, and he in fact had taken advantage of this policy in such circumstances.

**3.** In support of this conclusion, Warden McKune cited Dr. Schwegler's letter of June 15, 1992; defendant's inability to permanently accommodate plaintiff's limitations; plaintiff's failure to

provide a physician's statement indicating any change in medical status; and plaintiff's failure to provide any convincing evidence that Warden McKune should not take the action proposed.

**4.** In addition, on September 8, 1992, immediately after receiving the Warden's letter, plaintiff applied for unemployment compensation. Plaintiff had exhausted all accumulated sick leave and continued to be absent from work on unpaid leave status.

**5.** Plaintiff asked Krumm to represent him and authorized Krumm to discuss his circumstances with the Warden and to otherwise act on his behalf in employment matters. At all relevant times with respect to plaintiff's proposed termination, Krumm acted on plaintiff's behalf, with plaintiff's knowledge and consent, and as his agent.

tion to his problem of obesity, Pickwickian syndrome with sleep apnea, hypercarbia, and pulmonary hypertension secondary to increased pulmonary vascular resistance with attendant right heart failure, edema, and ascites.

It is, of course, impossible to predict when he will be ready for full activity. Right now, I believe he can work at light duty with no heavy exertion.

Until Dr. Harms examined him, plaintiff was "in denial" about his heart problem. After the examination, however, plaintiff told Krumm that his condition was worse than he thought and that the doctor gave no hope that he could return to full duty at any time in the foreseeable future. Plaintiff asked Krumm to contact Warden McKune and tell him: "McDonald went to the cardiologist, the cardiologist said he has had a heart attack, doesn't know the extent of the damage. Warden, it's up to you. Whatever you need to do or whatever you're going to do."[6] With plaintiff's knowledge and approval, Krumm relayed this information to Warden McKune.

In response to plaintiff's request, as communicated by Krumm, Warden McKune on October 1, 1992, advised plaintiff that effective October 2, 1992, he intended to proceed with the separation outlined in the letter of September 2, 1992. In communicating this action, Warden McKune stated as follows:

> [A]s we discussed in our meeting of September 9, 1992, the Lansing Correctional Facility cannot accommodate your current condition on a permanent basis. Therefore, I am left with no alternative but to proceed with the non-disciplinary separation, without prejudice, as discussed in my proposal of September 2, 1992. This separation will be effective close of business October 2, 1992.

If your condition improves to the point that you again are able to perform the duties of a Corrections Officer, to include the use of firearms, the ability to climb stairs and respond to alarms, and the ability to physically control inmates, as verified by your physician, your request for reinstatement will be given full consideration.

Pursuant to this letter, defendant did in fact terminate plaintiff's employment.

On March 16, 1993, plaintiff filed a charge of employment discrimination with the Kansas Human Rights Commission (KHRC) and the Equal Employment Opportunity Commission (EEOC). In both cases, plaintiff complained that defendant terminated his employment after he had suffered a heart attack and was placed on light duty; that plaintiff could perform light duty positions, but that defendant had not placed him in those positions; and that defendant had thus failed to reasonably accommodate his disability. The KHRC and the EEOC investigated plaintiff's complaints and found them to be without merit.

### *Analysis*

#### A. Disability Claims

Plaintiff claims that he suffered from multiple handicaps and disabilities, as outlined above, and that he required and requested reasonable accommodations which defendant refused to provide. Accordingly, plaintiff insists that defendant discriminated in the matter of his employment, in the terms and conditions of his employment, and terminated his employment in violation of the ADA and the Civil Rights Act of 1991. Plaintiff also claims that defendant discriminated against him on the basis of a "perceived disability."

#### 1. ADA Claims

■ In order to state a *prima facie* case of disability discrimination under the ADA,

---

**6.** Throughout the period involved in this suit, plaintiff remained on light duty status, to which he had been assigned in 1991. Plaintiff was not actually working, however, because doctors had not released him to return to work. As a result, plaintiff developed financial problems. Moreover, when Dr. Harms told plaintiff that he had suffered a heart attack, plaintiff testified, "I had to admit that I was not going to be able to fulfill the Warden's decree as it was. That I had some limitations and they weren't going to go away." As a result, plaintiff contacted Krumm about "the need to have some kind of income coming into [his] household." They decided that unemployment compensation was the way to accomplish this goal and plaintiff therefore asked Krumm to communicate with Warden McKune about the situation.

plaintiff must show that he is a "qualified individual with a disability" under 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Defendant argues that at the time it terminated plaintiff's employment, he was totally disabled from performing the material duties of his regular occupation. Accordingly, it claims that as a matter of law, plaintiff was not a "qualified individual with a disability" and he cannot establish a *prima facie* case of discrimination under the ADA.

In order to proceed with a claim under the ADA, plaintiff must show that he is a "qualified individual with a disability" as defined in 42 U.S.C. § 12111(8). Central to this definition is the requirement that plaintiff be disabled. Under § 12102(2)(A) of the ADA, plaintiff can meet this requirement by showing that he has a physical or mental impairment that substantially limits one or more of his major life activities. For purposes of this motion, defendant admits that plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities. Defendant argues, however, that plaintiff is not "otherwise qualified," with or without reasonable accommodation, to perform the essential functions of a Correctional Officer II position, *i.e.* the basic duties of law enforcement officers in a maximum security penitentiary. In response, plaintiff concedes that he cannot perform the essential functions of *those Corrections Officers who are assigned to posts that require physical restraint of inmates or being able to respond in a physical way to inmate riots, unrest or fires.* He argues, however, that Correctional Officers rotate among various posts; that several of the posts (gun tower, tool and key control, and clothing issue, in particular) require minimal physical exertion; that plaintiff is "probably" capable of working those

posts; that instead of rotating among *all of the posts* manned by Corrections Officers, he could rotate strictly among the foregoing light duty positions[7]; and that "a limited rotation of positions or posts" would be a reasonable accommodation to his disability.

█ Plaintiff has the burden to establish that he is "qualified" to perform the essential functions of the job, either with or without reasonable accommodation. *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372, 1385 (10th Cir.1981). The burden is then on defendant to either rebut those claims or establish that the accommodation required would engender undue hardship. *Dutton v. Johnson County Board of County Commissioners*, 859 F.Supp. 498, 505 (D.Kan.1994). Once the plaintiff produces evidence sufficient to make a facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. *Mason v. Frank*, 32 F.3d 315, 318 (8th Cir.1994); *Barth v. Gelb*, 2 F.3d 1180, 1185 (D.C.Cir.1993), *cert. denied*, ── U.S. ──, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994); *Gilbert v. Frank*, 949 F.2d 637, 640–42 (2d Cir.1991).

In *White v. York International Corp.*, 45 F.3d 357 (10th Cir.1995), the Tenth Circuit articulated a two-part analysis for determining whether a person is "qualified" within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

45 F.3d at 361–362, citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993),

---

7. At his deposition, plaintiff boasted that "[j]ust right off the top of my head, there was [sic] at least probably about nine or eleven different posts that I could have worked." Asked "what posts would those be?", plaintiff responded: "Clothing issue I could handle. Probably the

tool and key control sergeant. I think, basically, that would be the two of those. Any of the gun towers." Asked whether he could physically restrain a violent inmate, plaintiff replied: "That I wouldn't know until I'd get into it."

*cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

■ Since plaintiff must show that he was "otherwise qualified" as part of his *prima facie* case, and since that term includes the concept of "reasonable accommodation," plaintiff must show—in order to make out a *prima facie* case—that he can perform the essential functions of the job in spite of the handicap either (a) with no need for accommodation, or (b) with a reasonable accommodation. *Gilbert, supra,* 949 F.2d at 642. While reasonable accommodation may include such adjustments as "some job restructuring" or reassignment to a vacant position, *see* 29 C.F.R. § 1630.2(*o*)(2), reasonable accommodation does not mean elimination of any of the job's essential functions. *Gilbert, supra,* 949 F.2d at 642. Stated otherwise, for an accommodation to be reasonable, ·it must be effective in permitting a disabled employee to perform the essential job functions. *Dutton, supra,* 859 F.Supp. .at 507. An accommodation that eliminates an essential function of the job is not reasonable. *Pushkin,* 658 F.2d at 1385; *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985). Moreover, inherent in the concept of reasonable accommodation is a requirement that plaintiff be thereby enabled to perform the essential functions of the position without endangering his health and safety, and that of others. *Mason, supra,* 32 F.3d at 318, citing 29 C.F.R. § 1613.702(f); *Chandler, supra,* 2 F.3d at 1393; *Chiari v. City of League City,* 920 F.2d 311, 316–17 (5th Cir.1991).

■ On the undisputed facts of record in this case, the Court must readily conclude that the essential functions of the position of Correctional Officer II go well beyond those involved in manning the gun towers, clothing issue and tool and key sergeant positions at LCF. Plaintiff does not deny that such correctional employees are law enforcement officers who have hands-on responsibility for discipline, safety, and emergency preparedness in the maximum security prison environment at LCF. Clearly, the ability to stand for long periods, to respond quickly to emergencies, and to use force to subdue violent inmates, are more than marginally relat-

ed to the requirements of the correctional officer position. The same may be said of the need to use stairs, walk more than 100 feet, stand more than 15 minutes, bend, squat, and lift objects that cannot be lifted with one hand—all of which plaintiff is admittedly disabled from doing.

■ Because the foregoing requirements are essential functions of the correctional officer position, the Court must determine whether any reasonable accommodation would enable plaintiff to effectively perform the essential functions of his position.

■ Plaintiff admits that he cannot do what the Court has found are the essential functions of a correctional officer. As to possible accommodations, plaintiff's idea is that he rotate among the gun tower, clothing issue and tool and key sergeant positions, where he hopefully will have little contact with inmates, no occasion to respond in situations of physical emergency, and no need to stand, walk, lift, bend, squat or climb stairs. The Court notes that this is not an existing rotation and, so far as the record reflects, none of these positions, taken individually, are currently vacant. Plaintiff asks the Court to hold defendant liable for failing to create a *new* correctional officer rotation that does not require physical restraint of inmates or ability to respond in a physical way to inmate riots, unrest or fires. The ADA does not, however, require the employer to create a new position to accommodate the disabled worker. *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); *White, supra,* 45 F.3d at 361; *Chiari, supra,* 920 F.2d at 318; 29 C.F.R. pt. 1630, App. § 1630.2(*o*).

■ At trial, plaintiff would have the ultimate burden of proving that the requested accommodation is *reasonable.* The possibility of reasonable accommodation is a part of plaintiff's *prima facie* case. *White, supra,* 45 F.3d at 359–362; *Gilbert, supra,* 949 F.2d at 642. No burden shifts to defendant, of course, until plaintiff has established a *prima facie* case. In response to defendant's motion for summary judgment, plaintiff was required to come forward with specific facts showing that a genuine issue remains for

trial. Plaintiff has not met this burden with respect to the possibility of reasonable accommodation, and defendant is therefore entitled to summary judgment on plaintiff's ADA claim.[8]

This holding effectively disposes of the claim that defendant violated the ADA or otherwise discriminated against plaintiff on the basis of real or perceived disability, in terminating his employment.

### 2. Discrimination under Title VII and the KAAD

Plaintiff claims that defendant violated Title VII of the Civil Rights Act of 1991 and K.S.A. § 44–1001 *et seq.*, by discriminating against him on the basis of disability. In support of that claim, plaintiff relies upon facts and theories which are identical to those stated above. They meet the same fate, on this record.

### B. Intentional Infliction of Emotional Distress

Plaintiff claims that defendant's supervisors and other employees harassed him on account of his disabilities and committed various outrageous acts (unidentified on this record) for the sole purpose of humiliating and embarrassing him.

 Under Kansas law, a plaintiff claiming the tort of outrage, or intentional infliction of emotional distress, "must meet two threshold requirements by showing that (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) the plaintiff's emotional distress is so extreme and severe that no reasonable person should be expected to endure it." *Rupp v. Purolator Courier Corp.*, 790 F.Supp. 1069, 1073 (D.Kan.1992); *see also Bailey v. Kenney*, 791 F.Supp. 1511, 1527 (D.Kan.1992). As a matter of law, plaintiff cannot meet these requirements.

First, the Court identifies no conduct that could be regarded as extreme and outrageous. To the contrary, the record suggests that defendant (and Warden McKune in particular) made extraordinary efforts to help plaintiff save his job while meeting the legitimate correctional and security needs of the Lansing Correctional Facility. Second, plaintiff has neither alleged nor offered record evidence that he suffered extreme and severe emotional distress.

### C. Negligent Infliction of Emotional Distress

 Kansas law has long held that there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury. *E.g., Humes v. Clinton,* 246 Kan. 590, 598, 792 P.2d 1032, 1038 (1990); *Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. 1499, 1509 (D.Kan.1993); *Payne v. General Motors Corp.,* 731 F.Supp. 1465, 1474 (D.Kan.1990). The purpose of the physical injury rule is to guard against fraudulent or exaggerated claims, *Maddy v. Vulcan Materials Co.,* 737 F.Supp. 1528, 1534 (D.Kan. 1990); it also recognizes that emotional distress is a common experience in life and is usually trivial, *Freeman v. Kansas State Network, Inc.,* 719 F.Supp. 995, 1001 (D.Kan. 1989).

 In this case, plaintiff's claim for negligent infliction fails as a matter of law because plaintiff has not alleged any negligent conduct. It should go without saying that in order to recover for negligent infliction of emotional distress, plaintiff must allege and prove negligent conduct. *Tyrrell v. The Boeing Co.,* 1994 WL 114841 (D.Kan.1994). In this case, plaintiff's complaints relate exclusively to intentional conduct, *i.e.* harassment, persecution and other intentional discrimination. The Court has carefully reviewed the record and finds no allegations of negligence

---

**8.** Because the Court finds that plaintiff has failed to establish a *prima facie* case that defendant could reasonably accommodate his disability, the Court does not address defendant's argument that under Department of Corrections policy, officers must be available for prison-wide rotation to maintain the discipline, security and good order of the penitentiary, and that to permanent-

ly assign plaintiff to a light-duty rotation would impose undue hardship on the state penal system. These arguments derive from facts which are not set forth in the record in compliance with Rule 106(c) of the Rules of Practice and Procedure of this Court. All such arguments must therefore be disregarded for purposes of this analysis.

and no evidentiary support for any such claim.

### Conclusion

The Court has great sympathy for the circumstances in which plaintiff finds himself, after 14 years as a correctional officer. At the same time, in evaluating plaintiff's claims, the Court must be guided by evidence and not by sympathy. For the reasons stated above, the Court believes that on this record a reasonable jury could not find in favor of plaintiff on any of the claims advanced.

**IT IS THEREFORE ORDERED** that defendant's *Motion for Summary Judgment* (Doc. # 32) filed December 7, 1994, be and hereby is sustained.