**Reginald L. KEES, et al., Plaintiffs,**

v.

**Arthur WALLENSTEIN,
et al., Defendants.**

**No. C96–643WD.**

United States District Court,
W.D. Washington.

May 14, 1997.

Sidney J. Strong, Kimberly A. Konat, Strong & Konat, Seattle, WA, for plaintiffs.

Philip Anthony Tompson, Donald W. Heyrich, Diane Hess Taylor, King County Prosecuting Atty's Office, Seattle, WA, for defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

DWYER, District Judge.

### OVERVIEW

Plaintiffs are former corrections officers from the King County jail. Each plaintiff was separated from his position because, due to injury or other physical infirmity, he could not have direct contact with inmates. Plaintiffs have sued King County and various individual defendants under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, the Washington Law Against Discrimination (WLAD), R.C.W. 49.60, 42 U.S.C. § 1983, and state common law. Defendants have moved for summary judgment on all claims. Plaintiffs have moved for summary judgment on their ADA and WLAD claims. Only defendants have requested oral argument. The motions have been thorough-ly briefed and oral argument is not necessary.

### BACKGROUND

Robert Niece, Joseph McCreary, Reginald Kees and John Standley were employed as corrections officers at King County jail. Each suffered either an injury or other medical problem that prevented him from having direct contact with inmates. As a result, each was given a light duty "assignment" to a control room post.[1]

Arthur Wallenstein became Director of the King County Department of Adult Corrections ("DAD") in August 1990. Soon thereafter, it came to his attention that a number of officers had been on light duty for extended periods of time. Wallenstein viewed this as a problem for a number of reasons, and took steps to rectify it. He sought the guidance of the County's Office of Human Resource Management (OHRM) on the DAD's legal obligations.

The OHRM requested that the DAD, and other departments struggling with similar issues, forward lists of long-term light-duty employees. After obtaining the lists, the OHRM's job accommodation coordinator, Pamela Dowling, sent each listed employee a copy of the applicable job description and a list of its physical requirements, along with an evaluation to be filled out by the employee's doctor. When the results were in, Dowling determined whether the employee's condition was permanent, and if so, whether a reasonable accommodation could be made that would permit the employee to perform the essential functions of the job. If not, she attempted to reassign the employee to another County position through the County's Employment Placement Services program.

As to plaintiffs, it was found that their conditions were permanent and that no accommodation would permit them to have contact with inmates. Dowling determined the latter function to be essential to a corrections officer's job. Plaintiffs were relieved of their positions as corrections officers, and Dowling tried to place them in different county positions. These attempts were unsuccessful.

---

1. Plaintiffs received their light duty assignments in 1985, 1989, 1991, and 1994, respectively.

Kees, McCreary, and Niece were terminated as King County employees in April 1996. Standley resigned in January 1997.

In April 1995, plaintiffs' union, Public Safety Employees, Local 519, filed a grievance on their behalf. In June 1996, the County made a settlement offer. Each plaintiff was offered a DAD non-commissioned, support position such as office technician, jail receptionist, or jail aide, at his full corrections officer salary. Plaintiffs rejected the offer.

Plaintiffs filed this suit against King County and several individual defendants, alleging violations of the ADA, WLAD, and intentional and negligent infliction of emotional distress. Plaintiffs have also raised claims against Director Wallenstein under 42 U.S.C. § 1983. Plaintiffs seek, among other things, reinstatement to their corrections officers positions with one "accommodation"—permanent assignment to the control room.

The defendants (collectively "the County") have moved for summary judgment on all claims. With regard to the ADA and WLAD claims, the County argues that it is entitled to summary judgment because plaintiffs' medical conditions prevent them from performing the essential functions of the job with or without accommodation. Because the 1983 claim is predicated on the alleged ADA violations, Wallenstein argues that he is entitled to summary judgment on it as well. Finally, the County argues that the plaintiffs cannot make out prima facie cases for either negligent or intentional infliction of emotional distress. Plaintiffs have filed a cross-motion for partial summary judgment on their ADA and WLAD claims.

## DISCUSSION

### I. The County's Motion for Summary Judgment

Summary judgment under Fed.R.Civ.P. 56 may be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. An issue of material fact is one that affects the outcome of the case and requires a trial to resolve differing versions of the truth. *Ad-*

*miralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). In deciding the motion, the court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). However, the non-moving party must respond to an adequately supported motion by showing that a genuine issue of material fact exists; if the response falls short of that, summary judgment should be granted. Fed. R. Civ. Proc. 56(e); *T.W. Elec. Serv., Inc.,* 809 F.2d at 630–31.

### A. The ADA and WLAD Claims

■ To prevail on an employment discrimination claim under the ADA, or the WLAD, a plaintiff must establish:

(1) that he is disabled within the meaning of the ADA;

(2) that he is qualified, that is, able to perform the essential functions of the job with or without reasonable accommodation; and

(3) that the employer terminated him because of his disability.

*Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (1996).[2]

■ Plaintiffs cannot work in any position that requires them to have direct contact with inmates, and admit that there is no accommodation that would permit them to do so. *See* Kees Dep. at 51; McCreary Dep. at 7; Niece Dep. at 40; Standley Dep. at 13. The County argues that it is entitled to summary judgment because a corrections officer must be able to have direct physical contact with inmates in order to perform the essential functions of a corrections officer at the King County jail.

2. The Washington Supreme Court looks to federal interpretations of the federal anti-discrimination laws to interpret analogous provisions of Washington's laws against discrimination. *See*

*Clarke v. Shoreline School Dist. No. 412,* 106 Wash.2d 102, 118, 720 P.2d 793 (1986). The ADA analysis thus applies to the plaintiffs' WLAD claims as well.

### 1. Is the ability to have direct inmate contact an essential job function?

The Seventh Circuit, and several district courts, have held that the ability to perform a wide range of duties—most of which involve direct inmate contact—is an essential function of a corrections officer position. *See Miller v. Dept. of Corrections of the State of Illinois,* 107 F.3d 483, 485 (7th Cir.1997); *Johnson v. State of Maryland,* 940 F.Supp. 873, 878 (D.Md.1996); *McDonald v. State of Ks., Dept. of Corrections,* 880 F.Supp. 1416, 1423 (D.Kan.1995); *see also, e.g., Champ v. Baltimore County,* 884 F.Supp. 991, 998 (D.Md.1995) (ability to make forcible arrest, qualify with a weapon, and drive emergency vehicles essential functions of all Baltimore County police officer positions). The Seventh Circuit found the reason for this to be "obvious enough":

> In the case of correctional officers and other paramilitary and military personnel, the reason for having multiple able workers who rotate through the different duty positions is to be able to respond to unexpected surges in the demand for particular abilities. The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability for such a response.

*Miller,* 107 F.3d at 485.

The "essential function" question, however, is one of fact, not law. See 29 C.F.R. § 1630.2(n), App. A; *see Sharp v. Abate,* 887 F.Supp. 695, 698 (S.D.N.Y.1995) (finding genuine issue of fact as to whether supervision of inmates an essential job function at a particular facility). Thus, while the cases on point are instructive, they are not dispositive. In order to prevail on its motion the County must establish that there is no genuine issue as to whether the ability to perform duties requiring direct inmate contact is an essential function of a corrections officer *at the King County jail.*

The "essential functions" of a position are "the fundamental job duties of the position." 29 C.F.R. § 1630.2(n). In determining which functions are essential, the court may look at, among other things: (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the individual to perform the function; (5) the terms of the collective bargaining agreement; and (6) the work experience of past incumbents in the job and/or the work experience of current incumbents in similar jobs. 29 C.F.R. § 1630(n)(3).

These factors support the conclusion that the ability to handle inmates is an essential function of a corrections officer at the King County jail. For instance, the County has submitted numerous written job descriptions. The oldest, from 1976, provides that King County corrections officers "rotate shifts, with varying days off, and are expected to be able to perform the functions and duties of all shifts in all required areas of the jails." McCreary Dep. Ex. 2. The description goes on to provide that officers "are expected to handle a variety of potentially volatile and dangerous situations in a calm and competent manner" and "required to use the minimum physical restraint necessary to preserve the security of the jail and safety of staff and prisoners." *Id.* Subsequent job descriptions are in accord. *See* Cannon Dep. Ex. 1 (1993 description); Ex. 2 (1994 description); Ex. 3 (1994 description); Ex. 4 (1995 description); Ex. 8 (1996 description). These job descriptions are evidence that King County corrections officers are expected to handle various duties, including some that require physical contact with inmates.

But it is the consequences of not requiring corrections officers to have the physical ability to have direct contact with inmates that are dispositive in this case. Officers who cannot have contact with inmates cannot respond to emergencies when necessary. The County has submitted substantial, undisputed evidence that the ability to do so is an essential job function of a King County corrections officer regardless of the post to which he is assigned.

It is undisputed that a wide range of emergencies to which officers must respond, known as "codes," can and frequently do occur in the facility. Such emergencies in-

clude: inmate assaults on staff; inmate assaults on other inmates; inmates armed with weapons; and escape attempts. Hyatt Dec. at ¶ 3; Owens Dec. at ¶ 7. In 1994, 389 codes were called at the facility, and 403 other medical emergencies required the response of officers. In 1995, these numbers rose to 393 and 570, respectively. Owens Dec at ¶ 6.

When a code is called, all available officers not serving in a dedicated position are required to respond. Owens Dec. at ¶ 11. This includes officers on break in the lunch room, and those either in or waiting for an elevator. Officers are paid for their breaks for this reason. *See* Niece Dep. at 28:22; Standley Dep. at 37:14.

According to the County, response from such officers is essential for two reasons. First, speed in response to a physical assault or a medical emergency is essential, and could make the difference between life and death. The County has submitted substantial evidence that officers on or waiting for elevators are often the first, or some of the first, who are able to go to the scene of an emergency. *See* Owens Dec. at ¶ 29 ("On approximately 50 separate occasions, I was riding an elevator when the doors opened to reveal an officer struggling to physically restrain a resisting inmate"); Owens Dec. at ¶ 18–19 (officer on elevator was second one to arrive at scene of officer assault); Maning Dec. at ¶ 6 ("other than those in the immediate vicinity of the emergency, it is those who are waiting for elevators who are first able to respond"); Michael Briner Dec. at ¶ 5 (officers on elevator were among first to respond). Second, officers must wait until a sufficient number of officers arrive on the scene before they can respond to certain emergencies. Owens Dec. at ¶ 13. For instance, if a fight is taking place inside an inmate "tank," officers cannot enter the tank until a sufficient number of them arrive on the scene. Hyatt Dec. at ¶ 7. Unless a sergeant is present and determines otherwise, officers are not permitted to enter a tank unless ten or more of them are present. Haytt Dec. at ¶ 8; Owens Dec at ¶ 14. In one instance, officers had to wait until

enough of them arrived to outnumber the twenty inmates in the tank before it was safe to respond. Hyatt Dec. at ¶ 9. In another, all available off-duty corrections officers were summoned from home to assist in securing the building after an escape attempt. Mun Dec. at ¶¶ 5–6.

Plaintiffs answer that the control room positions they seek are dedicated. That is, even in an emergency, control room officers don't leave their posts. This is true, at least generally, *while the operators are at their posts.*[3] But it is still necessary for control room operators to respond to codes while they are on their breaks. In fact, the County has shown that it is perhaps more important for officers working dedicated posts to respond to codes during their breaks than it is for those not working such posts. The reason is that when an officer assigned to a dedicated post, such as a control room or a wing-officer post, takes a break, one of two floor activity officers (or rovers) takes over the dedicated position. If the floor wing-officer takes a break at the same time (as apparently often is the case), the other rover assumes his dedicated position, leaving no non-dedicated personnel on the floor to respond to emergencies. *See* Hyatt Dec. at ¶ 13. At such times, "response from other floors, especially the lunch room on the fifth floor, is critical." *Id.*

■ Next, plaintiffs argue that there is a genuine issue as to whether the ability to respond to emergencies during breaks is an essential job function because they were not required to respond to emergencies while on light duty. *See* Karstetter Dep., Ex. 9 to Pl. Motion for S.J., at 43:3–12. But that the plaintiffs were temporarily excused from performing certain essential duties of a corrections officer, due to injury, does not change what those essential duties are. *See Champ v. Baltimore County*, 884 F.Supp. 991, 1000 (D.Md.1995). The County has demonstrated that the ability to respond to emergencies is essential.

Further, the County has submitted evidence that the plaintiffs' and other light duty

3. Control room operators may, however, leave their posts when the ranking supervisor "has determined that the undesirability of vacating the post is outweighed by the extreme nature of the emergency situation." Pl. Opp. Ex. 5.

officers' failure to respond to codes while on breaks has jeopardized officer safety. Sergeant Dale Stroklund affirmed that there have been several occasions on third shift (10:30 p.m. to 6:30 a.m.) when an insufficient number of officers have responded to a code due in part to the large number of light duty officers assigned to that shift. Stroklund Dec. at ¶ 5. Sergeant Corinna Hyatt has affirmed the same. Hyatt Dec at ¶ 16. Both officers cite specific instances as examples. Stroklund Dec. at ¶ 6; Hyatt Dec. at ¶ 16. These statements are unrebutted. *See* Pl. Response at 12:10–14. Thus, to the extent the plaintiffs are arguing that there is a genuine issue as to the County's safety concerns because no safety problems arose during their light duty assignments, the argument fails.

Even when all reasonable inferences are drawn in plaintiffs' favor, the County has established that the ability to handle inmates is an essential function of a corrections officer at King County jail. Plaintiffs cannot perform that function, with or without accommodation. They are therefore not "qualified" within the meaning of the ADA. The County is entitled to summary judgment on the plaintiffs' ADA and WLAD claims.[4]

### 2. Plaintiffs' counterarguments on the essential function issue

Plaintiffs argue that they were permanently assigned to the control room position as an accommodation, and that they were adequately performing the essential duties of the control room position when fired. In essence, plaintiffs contend that the DAD created a permanent special position for them as an accommodation: control-room corrections officer who does not respond to emergencies. Thus, according to plaintiffs, the relevant question is not whether they can perform the essential functions of a corrections officer, but whether they can perform the essential functions of a corrections officer who is assigned to the control room and does not respond to emergencies. This argument is made both in response to the County's summary judgment motion and in support of plaintiffs' own motion for partial summary judgment.[5]

In support of their argument, plaintiffs cite *Valdez v. Albuquerque Public Schools*, 875 F.Supp. 740 (D.N.M.1994) and *Taylor v. Garrett*, 820 F.Supp. 933 (E.D.Pa.1993). Those cases stand for the proposition that an employee's inability to perform the essential functions of the position for which he was hired does not necessarily defeat a disability discrimination claim where the employee had been reassigned to a different position due to injury or disability prior to or at the time of his discharge. *See Valdez*, 875 F.Supp. at 743–45; *Taylor*, 820 F.Supp. at 938–40.

Plaintiffs' argument and reliance on *Valdez* and *Taylor* fail for a simple reason: there is no permanent light duty position at DAD. As a matter of DAD policy, light duty assignments are temporary, not permanent. Although the ADA provides that reassignment to a vacant position may be a reasonable accommodation, *see* 42 U.S.C. § 12111(9)(B), employers are not required to convert temporary light duty positions into permanent positions in order to accommodate disabled employees, *see, e.g., Champ*, 884 F.Supp. 991, 999–1000 (D.Md.1995); *see also Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir.1995) ("If the position, as it existed, was both temporary and subject to the terms of the collective bargaining agreement, [plaintiff's] occupation of that position would be subject to these limitations as well.").

Since at least 1988, the DAD's Standard Operating Procedures Manual (S.O.P.) has provided that "[e]mployees temporarily disabled due to illness or injury, may request permission to work a limited or light duty assignment while recuperating." S.O.P. Gen3 Sick7–8(G). "Such assignments are not meant to be permanent." S.O.P. Gen1 Pers8(H)(4). "In the event that an employee

---

4. Because all corrections officers must have the ability to respond to emergencies, the court need not address the County's alternative argument that corrections officers must have the ability to perform multiple posts because the scheduling system requires flexibility.

5. In their cross-motion, plaintiffs argue that the DAD provided them with permanent accommodations, which the DAD cannot disclaim without proving undue hardship. Pl. Mem. in Supp. of PSJ at 22. The factual predicate for this argument is that the control room assignments were intended to be permanent accommodations.

has sustained a permanent limitation, every effort will be made by the [DAD] to coordinate with King County Personnel Division a transfer to another position for which said employee is physically qualified." S.O.P. Gen1 Pers9(H)(5).

Plaintiffs do not address this written policy. Rather, they attempt to show through other evidence that they were permanently assigned to light duty. First, plaintiffs have submitted letters assigning plaintiff Niece to light duty "pending further notification" in 1987. *See* Pl. Motion for S.J. Ex. 10; 11. Second, they submit a 1987 policy statement regarding light duty assignments. *See* Ex. 12. The policy statement says nothing about the temporary or permanent nature of the assignments, but does state that such assignments would be "reviewed at three month intervals." *Id.* Third, plaintiffs submit a 1987 policy statement providing that officers on light duty would not be given "promotional assignments to positions requiring the ability to perform the full range of correctional duties." *See* Ex. 13. The statement recognized the DAD's "obligation to reasonably accommodate those staff whose post-employment physical condition has temporarily impaired their inability [sic] to perform the full range of correctional officer duty assignments." Fourth, plaintiffs submit a 1988 memo approving certain employees requests for limited duty status for "indefinite" periods of time. *See* Ex. 16. Fifth, plaintiffs submit 1987 and 1992 policy statements regarding sick-leave usage that except employees with documented extended illnesses or have suffered on-the-job injury or a "major medical event." *See* Ex. 14, 15. Finally, plaintiffs submit their own declarations that they "were told or led to believe that the control room assignment would be [theirs] as long as [their] medical limitations remained." *See* McCreary Dec. ¶ 8; Standley Dec. ¶ 7. Plaintiff Niece has affirmed that at some point, DAD Director Dean Olsen (apparently one of Wallenstein's predecessors) told him he would "have a job for life." Niece Dec. at ¶ 11.

None of this evidence rebuts the fact that since at least 1988, DAD's written policy has been that limited duty assignments are temporary.[6] That the DAD may have been lax in enforcing this policy does not change that fact. *See Champ*, 884 F.Supp. at 999–1000 (plaintiffs' 16–year light duty assignment did not convert temporary assignment into permanent one); *see also Gaither v. Anne Arundel County*, 94 Md.App. 569, 618 A.2d 244 (1993) (fact that county permitted employee to work light duty for 10 years did not create duty to continue practice).

When plaintiffs were fired they were corrections officers on temporary light duty, not permanent non-emergency-response control room operators. There is no such permanent position at DAD. The relevant question is thus whether they can perform the duties of a corrections officer, not whether they can perform the duties of a corrections officer assigned to the control room who is not required to respond to emergencies. Plaintiffs cannot perform the essential functions of a corrections officer with or without accommodation. The County's motion for summary judgment on plaintiffs' ADA and WLAD claims is granted.

### B. The § 1983 Claims

Plaintiffs' § 1983 claims against Arthur Wallenstein are predicated on the alleged ADA violations. Because there were no ADA violations, these claims must be dismissed.

■ Further, the individually named defendants, including Wallenstein, are entitled to qualified immunity. Government officials are entitled to qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It was not clearly established in 1995 (when plaintiffs were discharged) that it would be a violation of the ADA to discharge a corrections officer who was unable to have direct physical contact with inmates; in fact,

---

**6.** Plaintiff Niece was placed on light duty in 1985, before the DAD's policy was unequivocally stated in the S.O.P. However, regardless of his status in 1985, from 1988 onward Niece's light duty position was temporary as a matter of department policy. Niece cannot argue that any "conversion" of his status violated the ADA because the ADA took effect in 1992 and is not retroactive. *Brown v. General Tel. Co. of California*, 108 F.3d 208, 209 (9th Cir.1997).

it is not clearly established today. *See Miller*, 107 F.3d at 485 (discharge of officer unable to perform various duties of corrections officer did not violate ADA). The individual defendants are entitled to qualified immunity. Defendants' motion for summary judgment on plaintiffs' section 1983 claims against Wallenstein is granted on this alternative ground as well.

### C. The Negligent and Intentional Infliction of Emotional Distress Claims

■ To recover for intentional infliction of emotional distress, plaintiffs must show that they suffered extreme emotional distress as the intended result of defendants' extreme and outrageous conduct. *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wash.2d 46, 77, 821 P.2d 18 (1991). The County asserts that there is no evidence to support such claims, and the plaintiffs point to no specific evidence in response. In fact, they implicitly concede the point. *See* Pl. Opp. to Def. Mot. for S.J. at 15 ("The facts set forth above, and in Plaintiffs' [Cross–Motion] have met at least the *negligent infliction of emotional distress* standard."). Defendants' motion for summary judgment on plaintiffs' intentional infliction of emotional distress claims is granted.

■ The County argues that it is entitled to summary judgment on plaintiffs' negligent infliction of emotional distress claim because in Washington there is no duty to avoid the negligent infliction of emotional distress when discharging an employee. The cases it cites in support, however, do not stand for such a broad proposition. *See Calhoun v. Liberty Northwest Ins. Corp.*, 789 F.Supp. 1540, 1548 (W.D.Wash.1992) (no duty to avoid negligent infliction when firing an at-will employee for poor work performance); *Johnson v. Department of Social & Health Services*, 80 Wash.App. 212, 907 P.2d 1223 (1996) (state has no duty to avoid negligent infliction in resolving workplace disputes). The court need not reach this question, however, because even if such a duty exists, the claims here must fail.

■ To recover for negligent infliction of emotional distress, plaintiffs' mental suffering must be manifested by objective physical symptoms. *Hunsley v. Giard*, 87 Wash.2d 424, 436, 553 P.2d 1096 (1976). Plaintiffs have not pointed to any evidence of physical manifestations of their alleged mental distress. *See* Pl. Mem. in Opposition to Def's Mot. for SJ at 14–15. Defendants' motion for summary judgment on plaintiffs' negligent infliction of emotional distress claims is granted.

### II. Plaintiffs' Cross–Motion for Partial Summary Judgment on Their ADA and WLAD Claims

Because the County is entitled to summary judgment, plaintiffs' cross-motion is moot.

### III. Conclusion

The record shows without dispute that plaintiffs cannot perform the essential function of handling inmates with or without accommodation, and are thus not qualified individuals within the meaning of the ADA or the WLAD. The section 1983 claims fall with the ADA claims. Plaintiffs have not established prima facie cases of negligent or intentional infliction of emotional distress. Defendants' motion for summary judgment is therefore granted, and plaintiffs' cross-motion is denied as moot. Judgment will be entered accordingly.

The clerk is directed to send copies of this order to all counsel of record.