**F I L E D**
United States Court of Appeals
Tenth Circuit

AUG 19 1999

**PATRICK FISHER**
**Clerk**

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

STEVEN A. MARTIN,

      Plaintiff-Appellant and Cross-
      Appellee,

v.

STATE OF KANSAS,

      Defendant-Appellee and Cross-
      Appellant,

and

UNITED STATES OF AMERICA,

      Intervenor,

_____

COLORADO CROSS DISABILITY
COALITION and THE LEGAL
CENTER FOR PEOPLE WITH
DISABILITIES AND OLDER
PEOPLE,

      Amici Curiae.

Nos. 98-3102 & 98-3118

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 97-2025-JWL)**

Kirk W. Lowry, Palmer, Lowry & Leatherman, Topeka, Kansas, for Plaintiff-
Appellant and Cross-Appellee.

Edward F. Britton, Jr. and Lisa A. Mendoza, Kansas Department of Corrections, Topeka, Kansas, for Defendant-Appellee and Cross-Appellant.

Seth M. Galanter (Jessica Dunsay Silver with him on the brief), Attorneys, Department of Justice, Washington, D.C., for Intervenor.

William P. Bethke and Kristin A. Kutz, Kutz & Bethke, Lakewood, Colorado, and Kevin W. Williams, General Counsel, Colorado Cross Disability Coalition, Denver, Colorado, for Amicus Curiae Colorado Cross Disability Coalition.

Chester R. Chapman and Michael W. Breeskin, Denver, Colorado, for Amicus Curiae The Legal Center for People with Disabilities and Older People.

---

Before **EBEL,** Circuit Judge, **McWILLIAMS,** Senior Circuit Judge, and **LUCERO**, Circuit Judge.

---

**EBEL**, Circuit Judge.

---

Plaintiff-appellant Steven A. Martin ("Martin"), a former state corrections officer, appeals the district court's orders granting summary judgment in favor of the defendant-appellee State of Kansas ("State") on Martin's claims of disability discrimination and impermissible medical inquiry, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101-12213. The State cross-appeals the district court's denial of the state's motion to dismiss on the basis of Eleventh Amendment immunity.  Our jurisdiction arises under 28 U.S.C. § 1291.  For the reasons given below, we affirm.

## FACTS

Plaintiff-appellant Steve Martin was hired by the Kansas Department of Corrections ("KDOC") and worked for the Hutchinson Correctional Facility from 1978 to 1981. Martin was rehired by KDOC in 1987 and worked at the Lansing Correctional Facility ("LCF") until he was terminated on August 21, 1995. At the time he was discharged, he had attained the rank of Corrections Officer I ("COI").

LCF is a maximum security correctional facility for adult male offenders. Law enforcement personnel[1] work at LCF under the threat of assault, riots, escape, and other such disturbances that can result in injury or even death. A written job description for the COI position provides that a COI is responsible for, inter alia, supervising and maintaining discipline and control of inmates throughout the prison, and responding to emergency situations, including physically restraining or subduing inmates when necessary. The description notes that a COI may be subjected to extremes of heat and cold and poor ventilation, physical confrontation with inmates, and that because of the physical structure of the facility, the COI is required to negotiate stairs and swinging doors. In addition to a high school diploma, basic corrections officer training, a driver's license, and certification as a correctional officer, the position requires the

---

[1]A corrections officer employed by the KDOC is a law enforcement officer as defined in Kan. Stat. Ann. §§ 22-2202(13) and 75-5247a.

"ability to deal effectively with individuals under restraint," and the "ability to stand for long periods, respond quickly to emergencies, and use force to subdue violent inmates." KDOC also has an established post rotation policy intended to "provide a balance of qualified, experienced staff throughout the facilities at all times." Post rotation occurs, at minimum, on an annual basis. LCF policy states that "[s]ecurity staff shall be rotated to different security posts assignments on an annual basis in order to assist security staff in acquiring skills and experience required for promotion through the ranks, to assure equality and fairness of assignments and to prevent or counteract burnout in stressful or monotonous posts." Under KDOC policy, the warden is responsible for determining shift/post assignments "with the needs and goals of the facility given primary importance." In determining shift/post assignments, the warden shall consider an employee's experience, qualifications, performance, length of service, and post/shift preferences.[2] Employees' post and shift preferences "shall be considered as openings/vacancies occur." During his tenure as a corrections officer at LCF, Martin was assigned to a variety of posts; for the three years prior to his termination, Martin worked tower duty in one of 14 towers at the facility.

---

[2]Employees who have permanent civil service status may submit a post/shift preference sheet.

As part of its policy on security post rotation and shift assignments, LCF General Order 3,108 states that "[e]ach employee of LCF is requested to complete and submit to the Personnel Department, biannually, a Disclosure of Disability Form." The Order further provides that "[i]nformation submitted concerning disabilities or handicaps shall be considered in security post assignments and reasonable accommodations shall be made as necessary. Officers requesting accommodation of a disability or handicap shall submit a statement from the attending physician which specifies the officer's capabilities and limitations prior to each post rotation date . . . ."

The Disclosure of Disability Form[3] asks the employee to "place an 'X' after any disability below which presents a substantial barrier to your employment opportunities." The form then lists six categories of possible disability,[4] each accompanied by a brief description.

Martin did not fill out the Disclosure of Disability Form. Instead, on February 16, 1995, Martin submitted to the LCF Personnel Officer a letter from Martin's personal physician, Dr. Peter Cristiano, disclosing that Martin

---

[3]The Disclosure of Disability Form in the record before us instructs the employee to read and understand the information on the reverse side of the form, but the record before us contains only the front side of the form.

[4]The categories listed are: (1) visual; (2) hearing; (3) speech; (4) physical; (5) learning; and (6) other.

suffers from degenerative joint arthritis of the right knee, with decreased range of motion and pain. He has much difficulty running up and down steps frequently, [is] unable to tolerate any sudden cold temperature (this causes more pain), [is] unable to stand for long periods of time, and is unable to run to alarms. This is a permanent, chronic condition.

In response, on February 20, 1995, Warden David McKune wrote to Martin that there were no corrections officer positions at LCF that could accommodate Martin's restrictions on a permanent basis. The warden attached a COI position description and asked that Martin take it to a health care provider to obtain an opinion as to which of the COI duties Martin could perform. The warden also requested that the health care provider state when Martin would be "capable of performing the full range of duties of a Corrections Officer, including the ability to physically subdue and control violent inmates, maintain required firearms and other qualifications, and use lethal force if necessary."

On April 21, 1995, Dr. Cristiano wrote to the warden that he had reviewed the position description and that, in his medical opinion, believed that Martin could subdue or control violent inmates only with assistance; could use required firearms or chemical weapons; could not stand over one hour at a time; could not continuously run up and down stairs; and could not run. Dr. Cristiano did not indicate when Martin would be capable of performing the full range of duties of a corrections officer; rather, he stated that he would re-evaluate Martin's knee

condition in one year. In the meantime, Dr. Cristiano stated that he saw "no problem with tower assignments within the limits as previously described."

On May 3, 1995, Warden McKune wrote to Martin proposing to separate him without prejudice from his position as COI because he was unable to perform the full range of duties of a corrections officer. McKune acknowledged that Dr. Cristiano saw no problem with tower duty, but stated that the doctor's listed limitations affected Martin's "ability to be assigned in contact positions," and that there were "no corrections officer positions at the Lansing Correctional Facility which can accommodate [Martin's] restrictions on a permanent basis." On May 15, 1995, Warden McKune granted Martin a several-month extension in which to provide evidence that he was capable of performing the full range of duties of a corrections officer. McKune advised Martin that if he could not provide a medical release indicating that he could "perform the full range of duties of a corrections officer, including the ability to physically subdue and control violent inmates, maintain required firearms and other qualifications, and use lethal force if necessary," McKune would have no alternative but to separate Martin from his position.

On May 24, 1995, Martin filed a charge of discrimination with the EEOC, alleging that he suffered a "permanent, chronic arthritic condition" which prevented him from "running, climbing stairs continuously, and standing for long

periods of time." Martin stated that his doctor had notified LCF that he could perform the duties of his current tower assignment; Martin noted that he "should be able to remain in a tower indefinately [sic] if needed," given his seniority.

It is undisputed that Martin made no formal request with LCF for accommodation, and that Martin failed to provide the requested medical release. As a result, on August 21, 1995, Warden McKune notified Martin that he was being "separated without prejudice" from his position as COI. When Martin appealed his discharge, the Kansas Civil Service Board affirmed the warden's action.

Martin filed suit against the State alleging ADA violations on the basis of both an actual and a perceived disability. He also charged that the State's policy of requesting employees to disclose disabilities is an impermissible inquiry under the ADA, and that the State's policy of accommodating only temporary disabilities also violates the ADA.

The State moved to dismiss the suit on Eleventh Amendment immunity grounds. The district court denied the State's motion, ruling that the ADA represented a constitutional exercise of Congress's power under Section 5 of the Fourteenth Amendment, and that the ADA therefore was a proper abrogation of Eleventh Amendment immunity.

The State then moved for summary judgment, contending that Martin was not disabled within the meaning of the ADA; that Martin was not a "qualified individual"; that his "separation without prejudice" was not an adverse employment action; and that the State's policy of requesting employees to disclose disabilities was job-related and consistent with business necessity.

On February 3, 1998, the district court granted the State's motion for summary judgment on Martin's ADA claims of disability discrimination and impermissible medical inquiry. See Martin v. Kansas, 996 F. Supp. 1282 (D. Kan. 1998). In a separate order on March 4, 1998, the district court awarded summary judgment to the state on Martin's claim that the State's alleged policy of refusing to accommodate permanent disabilities violated the ADA, and dismissed Martin's case in its entirety. See Martin v. Kansas, 996 F. Supp. 1297 (D. Kan. 1998). Martin now appeals the district court's summary judgment ruling; the State appeals the court's ruling on its motion to dismiss on Eleventh Amendment immunity grounds.

## DISCUSSION

### I. Eleventh Amendment

The State argues that Martin's claims under the ADA should be dismissed because Congress did not enact the ADA's accommodation provisions pursuant to a valid exercise of power. Specifically, the State contends that the ADA goes

- 9 -

beyond other federal anti-discrimination statutes in that it not only prohibits discrimination but also imposes affirmative duties on the State and its agencies to make reasonable accommodations to the known disabilities of employees. The State submits that Congress exceeded its Section 5 enforcement powers under the Fourteenth Amendment in enacting the ADA, and thus improperly abrogated the State's Eleventh Amendment immunity with respect to suits under the ADA.

Because the State's assertion of Eleventh Amendment immunity challenges the subject matter jurisdiction of the district court, the issue must be resolved before a court may address the merits of Martin's underlying ADA claim. See Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012-16 (1998) (rejecting doctrine of hypothetical jurisdiction and instructing that challenges to Article III jurisdiction must be resolved before court may address merits of underlying claims).

Upon de novo review of the State's claim, see ANR Pipeline Co. v. LaFaver, 150 F.3d 1178, 1186 (10th Cir. 1998), we affirm the district court's denial of the State's motion to dismiss, and hold that Congress's statutory abrogation of Eleventh Amendment immunity in the ADA was a valid exercise of its Section 5 enforcement powers.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

- 10 -

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

A state's Eleventh Amendment immunity from suit is not absolute; either a state may waive its sovereign immunity or Congress may abrogate the states' sovereign immunity in the exercise of its Section 5 power to enforce the Fourteenth Amendment. See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 119 S. Ct. 2219, 2223 (1999).[5] As the State of Kansas did not waive its sovereign immunity by consenting to suit, its motion therefore depends on whether Congress properly abrogated the states' immunity through the valid exercise of its Section 5 powers.

The Fourteenth Amendment provides in part that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 of the

---

[5]In Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996), the Supreme Court made clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers. See Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 119 S. Ct. 2199, 2205 (1999) (citing Seminole Tribe, 517 U.S. at 72-73).

Fourteenth Amendment empowers Congress to enact "appropriate legislation" to "enforce" the provisions of the Fourteenth Amendment.  Id. § 5.

In Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996), the Supreme Court established a two-part test to determine whether Congress properly abrogated states' Eleventh Amendment immunity through the exercise of its Section 5 enforcement power:  first, a court must determine whether Congress "has unequivocally expressed its intent to abrogate the immunity"; and second, a court must determine whether Congress acted "pursuant to a valid exercise of power." Seminole Tribe, 517 U.S. at 55 (citations, quotations, and brackets omitted).

The parties agree that Congress expressed its unequivocal intent to abrogate states' immunity with respect to suits under the ADA.  See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.").  Thus, we need only determine whether Congress, in enacting the ADA, properly abrogated states' immunity pursuant to a valid exercise of its Section 5 enforcement powers.

In City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court discussed the limitation of congressional enforcement power under the Fourteenth Amendment, emphasizing that this power is "remedial" in nature.  See id. at 519

("Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation."). The Court went on to hold that there must be "a congruence and proportionality between the injury to be prevented or remedied and the means adapted to that end." Id. at 520. Accordingly, "for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 119 S. Ct. 2199, 2207 (1999) (discussing City of Boerne).

In City of Boerne, the Religious Freedom and Restoration Act ("RFRA") failed to meet this test because there was little record support that widespread religious bigotry was taking place, see City of Boerne, 521 U.S. at 531, and because RFRA's provisions were "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 532. Furthermore, RFRA attempted to expand the substantive meaning of the Fourteenth Amendment by imposing (in direct contravention of Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990)) a strict scrutiny standard of review for laws that burdened religious practices. The Court concluded that Congress acted in excess

of its enforcement authority in enacting RFRA, and struck down the statute. See id. at 536.

Several circuit courts have addressed whether Congress's enactment of the ADA was similarly in excess of its enforcement authority. We agree with these courts that the ADA does not run afoul of the "congruent and proportional" requirement of City of Boerne. See, e.g., Muller v. Costello, Nos. 98-7491, 98-7729, 1999 WL 599285 (2d Cir. Aug. 11, 1999); Amos v. Maryland Dep't of Public Safety and Correctional Servs., 178 F.3d 212, 218 (4th Cir. June 24, 1999); Kimel v. Florida Bd. of Regents, 139 F.3d 1426, 1433 (11th Cir. 1998); Coolbaugh v. Louisiana, 136 F.3d 430, 438 (5th Cir.), cert. denied, 119 S. Ct. 58 (1998); Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997), cert. denied sub nom. Wilson v. Armstrong, 118 S. Ct. 2340 (1998); see also Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 487 (7th Cir. 1997) (pre-City of Boerne case finding ADA a valid exercise of Congress' Section 5 powers). But see Alsbrook v. City of Maumelle, No. 97-1825, 1999 WL 521709, at *7 (8th Cir. July 23, 1999).

First, unlike the situation in City of Boerne (involving RFRA), Congress, when it enacted the ADA, made numerous findings of fact regarding the pervasiveness of discrimination against disabled persons. See 42 U.S.C. § 12101(a); Amos, 178 F.3d at 218-19 (citing 42 U.S.C. § 12101(a)(2)-(a)(3),

- 14 -

(a)(5)-(a)(6); H.R. Rep. No. 101-485, pt. 2 at 22, 30, 42 (1990), reprinted in 1990

U.S.C.A.A.N. 267, 303, 311-12, 324).[6]   The Supreme Court has held that

[6]Congress's findings included:

(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from

(continued...)

- 15 -

arbitrary discrimination by the state against disabled persons violates the Equal Protection Clause. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446 (1985). Thus, under Cleburne, the disabled are protected by the Fourteenth Amendment, and Congress is entitled to enforce this protection against the states. See Coolbaugh, 136 F.3d at 434. Given that it is Congress's prerogative to determine in the first instance what legislation may be needed to enforce the Fourteenth Amendment, its findings establishing the existence of widespread discrimination against the disabled are entitled to deference. See City of Boerne, 117 S. Ct. at 2172.

Second, the remedial purposes of the ADA are tailored to remedying and preventing the discriminatory conduct, and are thus congruent and proportional to the injury to be prevented or remedied. The Act only prohibits discrimination against "qualified individuals," and it requires only "reasonable accommodations" that do not impose an "undue burden" on the employer.

In sum,

> The ADA, unlike RFRA, is not attempting to impose a strict scrutiny standard on all state laws or actions in the absence of evidence of discrimination. . . . Rather, the ADA seeks to impose a scheme that will adequately prevent or remedy a well-documented problem of

---

[6](...continued)
stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society . . . .
42 U.S.C. § 12101(a).

discrimination without unduly burdening the state prison system. It subjects some laws and official actions to a "reasonable accommodation" requirement only to the point that the accommodation is not unduly burdensome. Such a scheme, unlike RFRA, does not redefine or expand [disabled persons'] constitutional protections, but simply proportionally acts to remedy and prevent documented constitutional wrongs.

Amos, 1999 WL 454509, at *6.

Accordingly, we join the Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits in holding that the ADA was a permissible exercise of Congress' Section 5 enforcement powers.

## II. ADA

We now address the merits of Martin's claims under the Americans with Disabilities Act.

We review the district court's grant of summary judgment de novo. See Smith v. Midland Brake, Inc., No. 96-3018, 1999 WL 387498, at *1 (10th Cir. June 14, 1999) (en banc). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Griffin v. Steeltek, Inc., 160 F.3d 591, 593 (10th Cir. 1998). In determining whether the case presents any issues of material fact, we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment, here Mr.

Martin.  See MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1440 (10th Cir. 1996).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Hardy v. S.F. Phosphates Ltd. Co., No. 98-8039, 1999 WL 401722, at *2 (10th Cir. June 18, 1999).

A. Discriminatory Discharge

The ADA prohibits discrimination by covered entities against qualified individuals with a disability.  See Sutton v. United Air Lines, Inc., 119 S. Ct. 2139, 2144 (1999).  Specifically, the statute provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); see Sutton, 119 S. Ct. at 2144.

To prevail on a claim of discriminatory discharge under the ADA, a plaintiff must show that (1) he or she is "disabled" within the meaning of the ADA; (2) he or she is a "qualified individual," that is, that he or she is able to perform the essential functions of the job with or without reasonable accommodation; and (3) that he or she was terminated because of his or her disability.  See Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1173 (10th

- 18 -

Cir. 1996); Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995); White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir. 1995).

In this case, the district court concluded that there was a dispute of material fact regarding whether Martin had an actual "disability" within the meaning of the ADA, see Martin v. Kansas, 996 F. Supp. 1282, 1289 (D. Kan. 1998),[7] and the State has not challenged this ruling on appeal; we therefore accept the district court's conclusion. Accordingly, we turn our attention to the second prong of Martin's claim, i.e., whether Martin is a "qualified individual."

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can

---

[7]The ADA defines "disability" as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Martin argued below that he was "disabled" under both subsections (A) and (C) of this provision. The district court held that there was a genuine issue of material fact as to Martin's claim of "actual disability" under subsection (A); however, the court ruled that Martin failed to survive summary judgment with respect to his "regarded as" claim of disability under subsection (C). See Martin, 996 F. Supp. at 1288-90. Martin does not appeal the district court's ruling with respect to subsection (C).

perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In light of this statutory provision, this Circuit has adopted a two-step inquiry to analyze whether a plaintiff is "qualified" under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Milton, 53 F.3d at 1123 (quoting White, 45 F.3d at 361-62).

### 1. Essential Functions

Thus, our first task is to determine whether Martin could perform the "essential functions" of his job. The term "essential functions" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Whether a particular function is essential is a factual inquiry. See 29 C.F.R. Pt. 1630, App. § 1630.2(n). The ADA provides that in making this inquiry, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the

essential functions of the job." 42 U.S.C. § 12111(8). EEOC regulations promulgated under the ADA provide that:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

The regulations further provide that evidence of whether particular function is essential includes not only the employer's judgment and written job descriptions, but also, inter alia, "[t]he amount of time spent on the job performing the function;" as well as "[t]he consequences of not requiring the incumbent to perform the function." See 29 C.F.R. § 1630.2(n)(3)(iii)-(iv).

With these factors in mind, we turn to the parties' arguments. The State contends that the essential functions of Martin's job included the broad list of duties required of all COIs. In addition to the job requirements set forth in the written position description and the rotation policy previously described, the State's physical requirements list for corrections officers states that corrections officers are regularly (i.e., on a daily basis) required to stand for long periods of

time, walk for some periods of time, stoop, kneel, crouch, and work in inclement weather (heat, cold, rain, snow, etc.); are frequently (i.e., on a routine basis) required to physically restrain persons in custody; and are occasionally (i.e., in a unique or emergency event) required to lift and/or move up to 100 pounds, climb or balance, crawl, restrain a violent inmate, assist in an evacuation, and run.

Martin argues that his "essential job functions" were the more limited responsibilities of his tower duty post, namely, to provide surveillance; visually monitor security controls; verbally report alarms; observe and record gate traffic; respond to alarms by use of firearms if necessary from the tower or wall; maintain logs; verbally report to a supervisor; and check the condition of radios, alarms and weapons. Martin contends that he could perform these duties, and emphasizes that he had been performing these duties satisfactorily for three years prior to being discharged.

We have recently observed in an ADA suit that "an employer may create a position, the nature of which requires an employee to perform a multitude of tasks in a wide range of environments." Anderson v. Coors Brewing Co., No. 98-1261, 1999 WL 444925, at *4 (10th Cir. June 30, 1999). In Anderson, the plaintiff contended that the essential functions of her job were limited to her particular assignment as a can sorter (which she was able to perform), rather than the broader duties of the position for which she was hired, Temporary Production

- 22 -

Operator ("TPO") (which she was unable to perform). Id. at *3. We rejected her argument that the district court should have considered only the essential functions of a can sorter position because she spent most of her time in that assignment, observing that the mere fact that the plaintiff spent the majority of her time on the can sorting line did not mean that the defendant had narrowed her job description from TPO to can sorter. Accordingly, we concluded that the district court properly considered the essential functions of the broader TPO position in determining whether the plaintiff was a "qualified individual" under the ADA. See id.

In reaching our conclusion in Anderson, we relied on the Seventh Circuit's analysis in Miller v. Illinois Dep't of Corrections, 107 F.3d 483 (7th Cir. 1997). Notably, Miller involved a corrections officer who suffered severe vision impairment in an auto accident. As a result, she was unable to perform the full range of duties required of correctional officers, and sought a limited rotation between the two posts she was still able to perform, telephone switchboard operator and armory officer. See id. at 485. The Seventh Circuit rejected her argument that she was a "qualified individual" based on her ability to perform the functions of the two particular posts, stating:

> [I]t seems to us . . . that if an employer has a legitimate reason for
> specifying multiple duties for a particular job classification, duties
> the occupant of the position is expected to rotate through, a disabled
> employee will not be qualified for the position unless he can perform

enough of these duties to enable a judgment that he can perform its *essential* duties. If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position. . . . In the case of correctional officers . . ., the reason for having multiple able workers who rotate through the different duty positions is to be able to respond to unexpected surges in the demand for particular abilities. The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions . . . as well as the capability [to respond].

Id. (citations omitted) (quoted in Anderson, 1999 WL 444925, at *4).

We note that in addition to the Seventh Circuit, several district courts have held that an essential function of a corrections officer position is the ability to perform a wide range of duties (usually involving inmate contact). See Kees v. Wallenstein, 973 F. Supp. 1191, 1197 (W.D. Wash. 1997), aff'd, 161 F.3d 1196 (9th Cir. 1998); Johnson v. Maryland, 940 F. Supp. 873, 878 (D. Md. 1996), aff'd, 113 F.3d 1232 (4th Cir. 1997) (unpublished); McDonald v. Kansas, 880 F. Supp. 1416, 1423 (D. Kan. 1995) ; Miller v. California Dep't of Corrections, No. C-96-01262-VRW, 1998 WL 917525, at *5 (N.D. Cal. Dec. 30, 1998) (unpublished).

We find McDonald particularly instructive. McDonald involved a corrections officer at LCF who contended that, although he could not perform the duties of those posts requiring physical restraint or contact with inmates or the

ability to respond to emergencies, he could perform the duties of certain other "light duty" posts (including tower duty), and therefore sought to have his post rotation limited to such positions. See McDonald, 880 F. Supp. at 1422-23. The district court concluded that, on the undisputed facts of record, the essential functions of Correctional Officer II at LCF "go well beyond" those involved in tower duty and the other light duty positions, observing that, "[c]learly, the ability to stand for long periods, to respond quickly to emergencies, and to use force to subdue violent inmates, are more than marginally related to the requirements of the correctional officer position." Id. at 1423. The plaintiff admitted that he could not perform what the court determined to be essential functions of an LCF corrections officer, and the court therefore ruled that no reasonable accommodation was possible because no permanent light duty positions existed at LCF that the plaintiff was qualified to perform, nor did the ADA require the prison to create such a position. See id.

Turning to the evidence in this case, we consider the factors listed in 29 C.F.R. § 1630.2(n) for determining the essential functions of a job, and conclude that Martin has failed to put forth sufficient evidence to create a genuine dispute of material fact rebutting the State's position that the essential functions of Martin's job were those broader functions of a corrections officer position, as opposed to the limited duties of a particular post. First, the State's written

position description and established post rotation policy reflect the State's judgment that corrections officers at KDOC are expected to perform a range of duties at a variety of posts, some of which require physical exertion and agility. The State has articulated a legitimate interest in having all corrections officers be capable of performing duties at all positions, in particular, the ability to respond to disturbances or prison riots. Although Martin points out that there are not a "limited number" of employees available who would be able to respond to such disturbances, see 29 C.F.R. § 1630.2(n)(2)(ii), we observe that the very reason a corrections officer position exists is to provide safety and security to the public, as well as to LCF employees and inmates; as such, the ability to provide safety and security, including the ability to respond without hesitation or limitation in an emergency is absolutely inherent to that position. See id. § 1630.2(n)(2)(i). Likewise, Martin would submit that continuous running and the physical restraint of violent inmates without assistance is not an everyday occurrence for any COI (let alone a COI assigned to tower duty), thereby undermining the State's characterization of these abilities as essential job functions. See id. § 1630.2(n)(3)(iii). However, we believe that the potentially dire consequences of not requiring a corrections officer to have those capabilities (even if exercised only occasionally) underscores their importance. See id. § 1630.2(n)(3)(iv).

Finally, Martin suggests that his seniority would have permitted him to remain on tower duty indefinitely, a position he capably performed for at least three years. Essentially, he argues that his seniority and pattern of assignment have modified his job description to include only tower duty. Although he had obtained tower post assignments for three years prior to his discharge, under the terms of LCF's post rotation policy, Martin cannot show that he was specifically entitled to, or guaranteed to obtain, any particular post based on his seniority. Even assuming, however, that he could have pulled tower duty for the remainder of his career at LCF, his tower assignment does not, in and of itself, call into question the State's assessment of his essential job functions as a COI. Martin was hired as a Corrections Officer I, not a Tower Officer. As was the case with the plaintiff in Anderson, even if Martin spent the majority of his time at LCF working a particular post assignment, that fact does not mean that the State narrowed Martin's COI job description to encompass only the duties of the particular post, see Anderson, 1999 WL 444925 at *3, especially given LCF's established rotation policy for its corrections officers, and considering the unique safety and security requirements of a maximum security correctional facility. We conclude that the evidence presented by Martin is insufficient for a jury to find that the essential functions of Martin's job were limited to the duties of his tower post position.

### 2. Reasonable Accommodation

Having concluded that the essential functions of Martin's job were the broader duties of a COI, and in light of the fact Martin did not provide a medical release as requested that indicated he could perform all the duties of a COI without limitation, we turn next to the second step of the analysis in Milton, i.e., whether any reasonable accommodation by LCF would enable Martin to perform the essential functions of his job. We conclude that the record fails to establish that any reasonable accommodation was possible.

Martin insists that he never at any time requested any accommodation. In any event, the only accommodation we can glean from the facts on this record would be for LCF to agree to permit Martin to remain on tower duty permanently. However, such an accommodation, even if it had been explicitly proposed, is not reasonable because it is tantamount to asking LCF to provide a permanent light duty post. No such permanent assignments exist at LCF, and the ADA does not require an employer to create a new position or even modify an essential function of an existing position in order to accommodate a disabled worker. See Smith v. Midland Brake, Inc., No. 96-3018, 1999 WL 387498, at *10 (10th Cir. June 14, 1999) (en banc); White, 45 F.3d at 362; 29 C.F.R. Pt. 1630, App. § 1630.2(o) (an employer is not required to reallocate job duties to change the essential functions of a job); see also Malabarba v. Chicago Tribune, Co., 149 F.3d 690, 697 (7th

- 28 -

Cir. 1998) (ADA does not require employers to convert temporary light duty jobs into permanent ones); Nguyen v. IBP, Inc., 905 F. Supp. 1471, 1485-86 (D. Kan. 1995) (same).

In sum, Martin has failed to establish a genuine dispute of material fact rebutting the State's contention that he is a "qualified individual" under the ADA. Because Martin cannot meet the second prong of his prima facie case of discriminatory discharge under the ADA, the district court properly granted summary judgment to the State on this claim.

B. Impermissible Medical Inquiry

Martin contends that, but for the State's request for information in its Disclosure of Disability Form, he would not have disclosed his disability, and probably still would be working at LCF. He claims that the State's disability disclosure policy constitutes an impermissible medical inquiry under the ADA.

Under 42 U.S.C. § 12112(d)(4)(A), an employer

shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity. [8]

_____

[8]We note that the ADA establishes different rules for pre-offer job applications, see 42 U.S.C. § 12112(d)(2); post-offer pre-employment examinations, see id. § 12112(d)(3); and inquiries of active employees, see id. § 12112(d)(4).

- 29 -

(Emphasis added.); see also 29 C.F.R. § 1630.13(b).[9] And, under §

12112(d)(4)(B), an employer is explicitly authorized to "make inquiries into the

ability of an employee to perform job-related functions."

As a general rule, the ADA prohibits a covered entity from requiring a

medical examination of an employee or to make inquiries as to whether an

employee is an individual with a disability or as to the nature or severity of such

disability.  See 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.13(b).  The purpose

of this prohibition is to prevent inquiries of employees that do not serve a

legitimate business purpose.  See 29 C.F.R. Pt. 1630, App. § 1630.13(b).

However, an employer may make medical inquiries of employees if the inquiry is

shown to be job-related and consistent with business necessity. See 42 U.S.C. §

12112(d)(4)(B); 29 C.F.R. § 1630.14(c).  Specifically, the ADA "permits

employers to make inquiries or require medical examinations (fitness for duty

exams) when there is a need to determine whether an employee is still able to

perform the essential functions of his or her job.  The provision permits

employers . . . to make inquiries or require medical examinations necessary to the

reasonable accommodation process . . . ." 29 C.F.R. Pt. 1630, App. § 1630.14(c).

---

[9]The EEOC promulgated regulations governing prohibited and permissible medical inquiries at 29 C.F.R. § 1630.13–.14.

The State contends that the Disclosure of Disability Form merely sought verification of an employee's ability to perform the essential functions of his job, or to begin the process of identifying appropriate and necessary reasonable accommodations for employees in need of such accommodation.[10] To support its assertion, the State points to LCF Order 3,102, which, as noted previously, provides that "information submitted concerning disabilities or handicaps shall be considered in security post assignments and reasonable accommodation shall be made as necessary." Relying on this written policy, the State maintains that the disclosure request is appropriately job-related and consistent with business necessity.

Martin contends that the disability disclosure form violates the ADA because it requests that the employee identify both the type of disability and the severity of the disability by placing an "X" after any of the listed categories of disabilities "which present[] a substantial barrier to your employment opportunities," and, where more than one disability is identified, circling that disability "which MOST affects your changes at employment." We acknowledge

---

[10]The State also emphasizes that the responses to the form were voluntary. However, even assuming that Martin understood that his response was wholly voluntary, we fail to discern anything in the statutory or regulatory framework that indicates that the legality of a medical inquiry (as opposed to a medical examination) hinges on the voluntariness of an employee's response to that inquiry.

- 31 -

that the ADA regulations state that "[a]n employer may not use an <u>application</u> <u>form</u> that lists a number of potentially disabling impairments and ask the <u>applicant</u> to check any of the impairments he or she may have."  29 C.F.R. Pt. 1630, App. § 1630.14(a) (emphasis added).  However, this regulation, cited by Martin in support of his claim, addresses <u>pre-employment</u> inquiries.  Under 42 U.S.C. § 12112(d)(2), an employer may not make <u>pre-employment</u> inquiries of an applicant as to whether the applicant is an individual with a disability, or as to the nature or severity of such disability (although an employer may make a pre-employment inquiry about the applicant's ability to perform job-related functions).   However, because the Disability Disclosure Form in this case is not a pre-employment inquiry, it is governed not by § 12112(d)(2), but rather, by § 12112(d)(4), which applies to inquiries of existing employees, and which excepts from the prohibition against inquiries regarding the nature or severity of a disability those inquiries that are shown to be job-related and consistent with business necessity.

Martin has failed to present evidence to rebut the State's written policy that the disclosure request is intended to gather information to be used in setting post assignments and establishing reasonable accommodations, which are job-related purposes that are consistent with business necessity.   Accordingly, Martin has

failed to establish that the State's policy violates § 12112(d)(4) of the ADA. The district court properly awarded summary judgment to the State on this claim.

C. Accommodation Policy

Finally, Martin contends that LCF had a policy of refusing to accommodate individuals with permanent disabilities. Martin claims that the State had a blanket policy of requiring employees to be "100% healed" before returning to work, which violates the ADA because the alleged policy does not allow for a required case-by-case assessment of an individual's ability to perform the essential functions of his or her job. In support of his claim, Martin relies on the State's light duty policy.

It is undisputed that LCF had a policy of assigning lighter duty posts to individuals with temporary physical impairments. However, the policy did not provide for permanent assignments to these lighter duty posts; in Martin's view, if an individual is unable to get full medical clearance within six months, the State will terminate the individual's employment.

We agree with the district court that the State's light duty policy is not tantamount to a "100% healed" policy or a refusal to accommodate permanent disabilities. See Martin, 996 F. Supp. at 1298. As we have acknowledged previously, the ADA does not require an employer to provide permanent light duty assignments for disabled employees. At best, Martin shows only that the

State's policy required him to be able to perform the essential job functions of a corrections officer, with or without accommodation. That is not a violation of the ADA; in fact it is what the ADA requires Martin to show to prove he is a "qualified individual."

## CONCLUSION

We AFFIRM the district court's denial of the State's motion asserting Eleventh Amendment immunity; we likewise AFFIRM the district court's award of summary judgment to the State on the merits of each of Martin's ADA claims.