196 P.3d 290

Barbara SUZUKI, Plaintiff–Appellant

v.

STATE of Hawai'i, Defendant–Appellee

and

Ted Sakai, Edwin Shimoda, Roy Yamamoto, May Andrade, John Manumaleuna, Francis Sequeria, and Doe Entities 1–10, Defendants.

No. 27180.

Intermediate Court of Appeals of Hawai'i.

Nov. 7, 2008.

As Corrected Dec. 4, 2008.

André S. Wooten, on the briefs, Honolulu, for plaintiff-appellant.

James E. Halvorson, Nelson Y. Nabeta, Deputy Attorneys General Department of the Attorney General, State of Hawai'i, on the briefs, for defendant-appellee.

NAKAMURA, Presiding Judge, FUJISE, and LEONARD, JJ.

Opinion of the Court by NAKAMURA, J.

Plaintiff–Appellant Barbara Suzuki (Suzuki) is an African–American woman who was employed by Defendant–Appellee State of Hawai'i (the State) as an Adult Correctional Officer (ACO) in the Department of Public Safety (DPS). Suzuki was 65 years old and working at the Oahu Community Correctional Center (OCCC) in the position of an ACO IV. The State barred Suzuki from working after a fitness-for-duty physical examination revealed that Suzuki could not meet the physical requirements of an ACO IV. Suzuki was not reassigned to another position and her employment with the DPS eventually ended.

Suzuki, initially proceeding pro se, brought suit against the State alleging six enumerated claims for relief: 1) gender discrimination, 2) retaliation, 3) disability discrimination, 4)

negligent hiring and retention, 5) infliction of emotional distress, and 6) negligence. The introductory fact section of Suzuki's complaint included allegations that she had been discriminated against because of her race and age. However, the complaint did not allege specific enumerated claims for relief based on race and age discrimination. The Circuit Court of the First Circuit (circuit court)[1] granted the State's motion for summary judgment on all claims asserted in Suzuki's complaint, and the circuit court entered its Final Judgment (Judgment) on February 15, 2005.

On appeal, Suzuki argues that the circuit court erred in: 1) granting the State's motion for summary judgment and 2) denying her motion to compel the State to produce the personnel files of certain DPS employees and other documents.

We hold that: 1) the circuit court properly ruled, on summary judgment, that Suzuki was not physically able to perform the essential functions of the ACO IV position; 2) the circuit court properly granted summary judgment on most of Suzuki's allegations of discrimination, but erred in granting summary judgment on Suzuki's claims that the DPS discriminated against her on the basis of race[2] and gender in failing to reassign her to a light-duty position; 3) the circuit court properly granted summary judgment on Suzuki's retaliation claim; and 4) Suzuki waived any challenge to the circuit court's grant of summary judgment on her claims of negligence, negligent hiring and retention, and infliction of emotional distress by failing to properly assert error or present argument regarding those claims in compliance with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28. We further hold that the circuit court erred in: 1) its blanket refusal to compel production of the personnel files of other ACOs who were given light-duty work and 2) its refusal to compel production, after in camera review, of any portion of the personnel file of Alberta Maglinti (Maglinti), a non-African-American who was selected to fill the vacant receptionist position for which

Suzuki had applied. Accordingly, we affirm the circuit court's Judgment in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

### I. Facts

Suzuki began working for the DPS as an ACO in 1978. In 2000, Suzuki was 65 years old and held the position of ACO IV. In March 2000, Suzuki suffered a stroke as she was completing her shift at OCCC. Suzuki returned to work in July 2000 and, in September 2000, she was evaluated as "meet[ing] all expectations" for an ACO IV on an employee performance appraisal.

On October 3, 2000, the DPS informed Suzuki that it was concerned that "medical conditions may exist that potentially could inhibit [her] from fulfilling [her] duties as a Corrections Officer." Suzuki was barred from OCCC and placed on leave while undergoing a fitness-for-duty examination. Three other ACOs, Maglinti, Taumuli Vea (Vea), and Judith Cunningham (Cunningham), were also barred from OCCC pending further notice.

Dr. Kathryn Shon (Dr. Shon), Suzuki's treating physician, examined Suzuki on October 16, 2000. Dr. Shon completed an Estimated Functional Capacities Evaluation Form which stated that Suzuki could return to her usual customary employment. However, Dr. Shon also noted on the form that Suzuki had severe physical limitations. Suzuki was prohibited from lifting more than ten pounds and from squatting, crawling, climbing ladders, kneeling, or crouching. Dr. Shon also placed limitations on Suzuki's bending, twisting, and climbing stairs. At her deposition, Dr. Shon indicated that Suzuki had fully recovered from her stroke and her physical limitations were a result of her arthritic knees and back.

Because of the physical limitations noted in the evaluation, the DPS sent a letter to Dr. Shon asking her to reevaluate Suzuki's abili-

---

**1.** The Honorable Sabrina S. McKenna presided.

**2.** As discussed *infra,* we construe Suzuki's complaint as including a claim of race discrimination.

ty to return to her ACO duties. The letter stated that:

THE DUTIES OF AN ACO REQUIRE VARIOUS PHYSICAL ABILITIES, WHICH INCLUDE, BUT ARE NOT LIMITED TO THE SECURITY AND CUSTODY OF INMATES. DUE TO THE NATURE OF THE JOB REQUIREMENTS, NO MODIFICATIONS CAN BE MADE TO THESE ESSENTIAL DUTIES AND RESPONSIBILITIES. ACOS WORK ON A ROTATIONAL BASIS AND ARE THEREFORE REQUIRED TO RESPOND TO ANY EMERGENCY SITUATION WHICH MAY INCLUDE NATURAL DISASTERS, RIOTS, INMATE ALTERCATIONS, AND ESCAPE ATTEMPTS.

Attached to the DPS's letter was a copy of the job description and task requirements (position description) for an ACO IV. The position description stated that ACOs are expected to participate in routine activities to ensure safety within the correctional facility, such as inmate searches and inmate cell inspections, as well as respond to emergency situations. The position description listed physical tasks an ACO IV must be able to perform as including: 1) occasionally (1–33% of the work day) lift and carry 90 pounds, run, climb stairs and ladders, bend, crawl, kneel, crouch, and reach overhead; 2) frequently (34–66% of the day) squat, reach forward, twist, and side bend; and 3) constantly (67–100% of the day) stand, walk, and stoop.

After reviewing the physical requirements for an ACO IV, Dr. Shon opined that Suzuki would not be able to return to her duties as an ACO. Based on Dr. Shon's opinion, the DPS did not permit Suzuki to return to work.

Suzuki remained on unpaid leave after the DPS determined she was unfit to resume her position.

Although Dr. Shon opined that Suzuki could not perform the duties of an ACO, Dr. Shon found that Suzuki "would be able to work full-time in a position that did not require heavy lifting, bending, stooping, crawling, walking or standing for extended periods of time." While on unpaid leave in 2001, Suzuki applied for but was not reassigned to a vacant receptionist position within the DPS. Instead, Maglinti, who had been disabled by a non-work-related injury, was selected for the position.

## II. Procedural History

On November 18, 2002, Suzuki filed a complaint in circuit court against the State, the Director of the DPS, Ted Sakai (Sakai), and several DPS employees who had supervised Suzuki (collectively, "the Defendants"). The claims in the complaint against Suzuki's DPS supervisors [3] were later dismissed for failure to serve them with the complaint, and the claims against Sakai were dismissed because service of the complaint on him had been untimely. Suzuki does not challenge these dismissals on appeal.

### A.

Suzuki's complaint alleged the following six enumerated claims for relief: 1) employment discrimination on the basis of gender; 2) retaliation; 3) disability discrimination; 4) negligent hiring and retention; 5) infliction of emotional distress; and 6) negligence. Suzuki's discrimination and retaliation claims were based on Hawaii Revised Statutes (HRS) § 378–2 (Supp.2007).[4] In the intro-

---

**3.** The DPS supervisors that Suzuki named in the complaint were Edwin Shimoda, Roy Yamamoto, May Andrade, John Manumaleuna, and Francis Sequeria.

**4.** Hawaii Revised Statutes (HRS) § 378–2 (Supp. 2007) provides, in relevant part:

It shall be an unlawful discriminatory practice:
(1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against

any individual in compensation or in the terms, conditions, or privileges of employment;
. . . .
(2) For any employer, labor organization, or employment agency to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part[.]

ductory fact section of her complaint, Suzuki alleged that she was "discriminated against because of her gender, race, age, [and] subjected to retaliation." She also alleged that "other non-Black, younger, male employees had applied for and been transferred to work within the DPS after they were no longer fit to be ACOs." However, Suzuki's claims for relief did not include separate enumerated claims based on race or age discrimination.

Suzuki filed her complaint pro se. Suzuki subsequently retained counsel, who filed a notice of appearance in the case on May 7, 2003. The DPS refused to pay Suzuki her retirement benefits until she resigned. Suzuki retired, under protest, from the DPS effective December 2004.

### B.

On December 15, 2004, Suzuki filed a motion to compel the production of the following documents: 1) the personnel files of similarly situated ACOs who suffered strokes; 2) the personnel files of the three other ACOs, Maglinti, Vea, and Cunningham, "who were locked out of OCCC on or about October 4, 2002[sic]," [5] when Suzuki was also removed from her job; 3) pay records of the four other ACOs who were put out of work "on October 4, 2002[sic]," including Maglinti, Cunningham, and Vea; [6] 4) the entire personnel files of all ACOs given light duty by "the Defendant" [7] from 1980 through 2003; 5) a copy of the personnel files and medical records of Patrick Fernandez (Fernandez); and 6) all ACO agility test scores for 1993 through 2003. The State argued that requests 1, 4, and 6 should be denied as overly broad and that requests 2, 3, and 5 should be denied because Suzuki failed to demonstrate that the requested employee personnel files were relevant to Suzuki's claims or that her need for the documents outweighed the employees' privacy interests.

The circuit court held a hearing on Suzuki's motion to compel on January 3, 2005. The court denied the motion, except that it ordered that the personnel files of Cunningham, Fernandez, Maglinti, and Vea be produced for the court to review in camera. The court noted that Suzuki sought these personnel files to obtain evidence to support her contention of disparate treatment. After reviewing the personnel files of the four individuals, the circuit court refused to order the State to produce any portion of these files to Suzuki. The court issued its written decision on Suzuki's motion to compel eight days before the hearing on the State's motion for summary judgment.

### C.

The State filed a motion for summary judgment on December 16, 2004. It argued that Suzuki had failed to establish a prima facie case for her claims of gender discrimination, disability discrimination, and retaliation, and that even assuming Suzuki had established a prima facie case, she failed to show that the State's non-discriminatory reasons for removing her from her job were pretextual. The State further argued that Suzuki failed to establish a prima facie case of intentional infliction of emotional distress, negligence, negligent infliction of emotional harm, or negligent hiring and retention and that those claims were also barred by the doctrine of sovereign immunity pursuant to HRS § 662–15(3) (1993) [8] because the employment discrimination and workers' compensation laws already provided a remedy for those claims.

In support of its motion for summary judgment, the State submitted the following evidence:

1. Excerpts from Suzuki's deposition.

Suzuki testified that prior to being barred from returning to work, she had been as-

---

**5.** The record indicates that the correct date was on or about October 4, 2000.

**6.** Although the request refers to four other ACOs, it only identifies three individuals by name.

**7.** We presume Suzuki meant the State, specifically the DPS, in referring to "the Defendant."

**8.** HRS § 662–15(3) provides that the State's waiver of sovereign immunity for liability for the torts of its employees shall not apply to "[a]ny claim for which a remedy is provided elsewhere in the laws of the State[.]"

signed to Module 11 at OCCC, which housed approximately 48 pretrial detainees. Suzuki was responsible for the custody and control of all the inmates in Module 11. ACO III recruits were assigned to help Suzuki but at times she worked alone.

2. Declaration of Larry Patterson (Patterson), the Security Coordinator for the DPS.

Patterson declared that based on his position as Security Coordinator and his work experience, he was familiar with the essential functions and duties of correctional officer positions, including an ACO IV. Patterson stated:

4. The essential function of a correctional officer assigned to a residential module, as those found in OCCC in the year 2000, is to supervise and monitor inmates. This involves participating in routine activities to insure the safety of those in a correctional facility such as inmate searches and inspection of inmate cells. In order to effect an appropriate search of an inmate or properly inspect a cell, a correctional officer must be able to physically kneel, bend down, crouch, squat, crawl, stoop and twist his torso.

5. The essential function of a correctional officer assigned to a residential module, as those found in OCCC in the year 2000, also involves responding to emergencies, including natural disasters, riots, inmate altercations and escape attempts. In order to effectively respond to such emergencies a correctional officer must be able to run, climb stairs or ladders, administer CPR, assist in carrying a stretcher, help lift an injured inmate, restrain a violent inmate or defend another or himself from assault.

6. A person who is not physically able to participate in the abovementioned routine activities or respond to emergencies is not qualified to serve as a correctional officer.

3. Declaration of Roy Yamamoto (Yamamoto), the Personnel Officer for the DPS.

Yamamoto stated that he had submitted a letter to Dr. Shon asking whether Suzuki could safely return to work as an ACO and had attached documents accurately describing the relevant duties and tasks for the position of ACO IV. Yamamoto further stated that based on Dr. Shon's medical opinions, the DPS did not allow Suzuki to serve as an ACO IV because she would not be able to perform the duties or tasks expected of that position.

4. Excerpts from Dr. Shon's deposition.

Dr. Shon testified that because of the degenerative arthritic condition of Suzuki's knees and low back, Suzuki would have difficulty performing the described duties of an ACO IV. Dr. Shon confirmed the physical restrictions she had placed on Suzuki in the Estimated Functional Capacities Evaluation Form as well as her opinion that Suzuki would not be able to return to her duties as an ACO. Dr. Shon testified that given Suzuki's physical limitations, Suzuki would have difficulty searching inmates and their cells, defending herself and others, squatting, twisting, side bending, walking more than 100 steps without resting, climbing a flight of 10 to 15 stairs more than twice a day, or running. Suzuki could not carry inmates, restrain inmates, or break up fights.

5. Declaration of Eric Nitta (Nitta), Chief of the Employee Relations Unit for the DPS.

Nitta testified that Suzuki had filed two workers' compensation claims with the Department of Labor and Industrial Relations (DLIR). On December 27, 2000, Suzuki filed a claim alleging that her March 2000 stroke was caused by exposure to secondhand smoke at OCCC and work-related stress. On June 26, 2002, Suzuki filed a second claim alleging that she had developed emphysema in October 2000 because of exposure to secondhand smoke while at OCCC. Both of Suzuki's workers' compensation claims were denied by the Director of the DLIR in decisions issued in 2003 because the Director found that the injuries were not work-related. Copies of these decisions were attached to the State's summary judgment motion. There was no record of Su-

zuki filing a claim for workers' compensation benefits based on degenerative joint disease.

Nitta stated that it was the policy of the DPS to assign only employees disabled by a work-related injury, and not employees suffering a non-work-related injury, to temporary light-duty assignments:

7. Under the Department's policy, an employee found to have suffered a compensable injury under the workers' compensation system, and unable to discharge his or her employment duties, can be temporarily reassigned within the department from the employee's regular position to a position that is consistent with the employee's physical limitations caused by the compensable injury. This is known as a temporary light duty assignment.

8. Under the Department's policy, an employee who suffers from an injury that is not work related and therefore not compensable under the workers' compensation system is not qualified for a temporary light duty assignment.

Nitta further stated that because Suzuki did not suffer a work-related injury, she did not qualify for a temporary light-duty assignment:

9. Barbara Suzuki was not qualified for a temporary light duty assignment because physical limitations which she suffered were not determined to be work related and therefore not compensable under the workers' compensation system, as indicated by the above mentioned decisions of the Disability Compensation Division, Department of Labor and Industrial Relations, State of Hawai'i.

Suzuki filed her own declaration and a memorandum of law in opposition to the State's motion for summary judgment. In her declaration, Suzuki asserted, among other things, that after her stroke, she was told she had to take an agility test to return to work whereas numerous other employees (whom she named) were allowed to return to work after illnesses and injuries without taking an agility test; that her medical conditions were attributable to work-related stress and exposure to secondhand smoke and asbestos; and that the DPS refused to pay her retirement benefits unless she resigned.

Suzuki disputed the State's claim that she could not perform the essential functions of an ACO IV, and she contested certain aspects of the description of duties and requirements for an ACO IV that the DPS had provided to Dr. Shon. Suzuki stated that "[a]s a supervisor, she never climbed ladders, ran, squatted, or crawled"; that the 90–pound lifting requirement was spurious and is not "generally required" of the actual job; that as an ACO IV supervisor, she would normally send an ACO III to perform cell extractions and perform CPR; that "ACO IVs at [the Halawa Correctional Facility (Halawa)] do not deal with inmates personally, they sit behind bullet-proof glass and push the buttons opening and closing gates"; and that she knew many female ACOs at Halawa who could not lift 90 pounds or break up fights.

Suzuki stated that other partially disabled ACOs who are not African–American, including "local males" (whom she named) with medical problems, were given light-duty jobs that she, "a black female ACO IV," was denied in a discriminatory fashion. She also asserted that Maglinti, who along with Suzuki had been barred from work in October 2000, was transferred to the light-duty receptionist job for which Suzuki had applied. Suzuki described this as "[a]n act of racial discrimination." With respect to her retaliation claim, Suzuki asserted that she filed an official grievance against May Andrade (Andrade) for refusing to accommodate Suzuki's weakness from her stroke by excusing Suzuki from firearms qualification.

On January 18, 2005, the circuit court held a hearing on the State's motion for summary judgment. The circuit court found that Suzuki had failed to make a prima facie showing that she was qualified to perform the essential functions of her job. With respect to Suzuki's argument that the DPS discriminated against her by failing to reassign her to a light-duty position, the court found that Suzuki had failed to present admissible evidence of disparate treatment. The court granted the motion for summary judgment, and on February 15, 2005, it issued its Judg-

ment in favor of the Defendants on all claims raised in the complaint.

## DISCUSSION

### I.

■ At the outset, we note that Suzuki asserts on appeal that she was a victim of race discrimination. Although Suzuki alleged that she was injured by race discrimination in the introductory fact section of her complaint and in other pleadings filed with the circuit court, including in her opposition to the State's motion for summary judgment, Suzuki's complaint did not allege a specific enumerated claim for relief for race discrimination. However, "Hawaii's rules of notice pleading require only that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests, and that pleadings be construed liberally." *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship,* 115 Hawai'i 201, 216 n. 17, 166 P.3d 961, 976 n. 17 (2007) (brackets, ellipsis, internal quotations, and citations omitted).

■ Our review of the record reveals that the State was aware that Suzuki was asserting a claim of race discrimination. For example, in pretrial statements filed with the circuit court, the State asserted that it planned to call witnesses "to testify regarding the facts and circumstances surrounding Plaintiff's allegations of discrimination based on age, race, sex, disability, and also retaliation." Indeed, in its answering brief on appeal, the State argues that "[Suzuki] failed to establish a prima facie case for gender *or racial discrimination.*" (Emphasis added.) Under the circumstances of this case, we conclude that the State had fair notice that Suzuki was asserting a claim of race discrimination and construe her complaint as including this claim.[9]

9. Suzuki's complaint also alleged age discrimination in the introductory fact section but did not include an enumerated claim for relief based on age discrimination. However, Suzuki does not assert on appeal that she has a viable claim of

### II.

Suzuki contends that the circuit court erred in granting summary judgment for the State on her claims of disability, race, and gender discrimination arising out of the State's removing her from her ACO IV position. In particular, Suzuki claims that the court erred in ruling that she could no longer perform the essential functions of her ACO IV job. She further contends that evidence that the DPS discriminated against her on the basis of disability, race, and gender by failing to reassign her to a light-duty job, as it had done for other ACOs, precluded summary judgment.

The standard by which we review a circuit court's ruling on a motion for summary judgment is well settled:

"We review the circuit court's grant or denial of summary judgment *de novo,*" *Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005), using the same standard applicable to the circuit court. *Iddings v. Mee–Lee,* 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c).

Once the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law, the opposing party "may not rest upon the mere allegations or denials of [the opposing party's] pleading" but must come forward, through affidavit or other evidence, with "specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e). If the opposing party fails to respond in this fashion, the moving party is entitled to summary judgment as a matter of law. *Hall v. State,* 7 Haw.App. 274, 284,

age discrimination or that the circuit court erred in rejecting any claim of age discrimination. We therefore conclude that she had abandoned any claim of age discrimination.

756 P.2d 1048, 1055 (1988); *see also* HRCP 56(e).

The Hawai'i Supreme Court has explained the moving party's burden of demonstrating its entitlement to summary judgment as follows:

> A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed. In effect the moving party takes the position that he is entitled to prevail ... because his opponent has no valid claim for relief or defense to the action, as the case may be. He thus has the burden of demonstrating that there is no genuine issue as to any material fact relative to the claim or defense and he is entitled to judgment as a matter of law.
>
> He may discharge his burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent. For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless....

*First Hawaiian Bank v. Weeks,* 70 Haw. 392, 396–97, 772 P.2d 1187, 1190 (1989) (quotation marks, brackets, and citations omitted).

The United States Supreme Court, in construing Federal Rules of Civil Procedure (FRCP) Rule 56(c), on which HRCP Rule 56(c) is modeled, has similarly stated:

> In our view, the plain language of [FRCP] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. The standard for granting summary judgment mirrors the standard for a directed verdict under [FRCP Rule] 50(a)....

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks and brackets omitted); *see, e.g., Wagatsuma v. Patch,* 10 Haw. App. 547, 562, 879 P.2d 572, 582 (1994) (noting that, for purposes of judicial review, "[s]ummary judgment is analogous to a directed verdict").

*Wittig v. Allianz, A.G.,* 112 Hawai'i 195, 200, 145 P.3d 738, 743 (App.2006).

In addition, "[t]he evidence must be viewed in the light most favorable to the non-moving party." *Querubin,* 107 Hawai'i at 56, 109 P.3d at 697. In general, "[s]ummary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." *Miller v. Manuel,* 9 Haw.App. 56, 65–66, 828 P.2d 286, 292 (1991) (internal quotation marks and citation omitted).

### A.

To establish a prima facie case under HRS § 378–2 that the loss of her ACO IV position was due to disability discrimination, Suzuki must establish that: 1) she is an individual with a "disability" within the meaning of the statute; [10] 2) she is qualified, with or without reasonable accommodation, to perform the essential duties of her job; and 3) she suffered an adverse employment decision because of her disability. *French v. Hawaii Pizza Hut, Inc.,* 105 Hawai'i 462, 467, 99 P.3d 1046, 1051 (2004); *Dargis v. Sheahan,* 526 F.3d 981, 986 (7th Cir.2008). Because of the textual similarity between the Americans With Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, and the Hawai'i statutes and

---

**10.** HRS § 378–1 (1993) defines the term "disability" to mean "the state of having a physical or mental impairment which substantially limits one or more major life activities, having a record of such an impairment, or being regarded as having such an impairment."

administrative rules prohibiting disability discrimination, we have looked to the federal courts' interpretation of the ADA for guidance. *French,* 105 Hawai'i at 467, 99 P.3d at 1051.

The State did not dispute in the circuit court or on appeal that Suzuki is an individual with a disability within the meaning of HRS §§ 378–1 and 378–2. We therefore assume for purposes of this appeal that Suzuki is an individual with an eligible disability. There is no dispute that Suzuki suffered an adverse employment decision when she was removed from her ACO IV position. Thus, Suzuki's claim that she lost her position due to disability discrimination turns on whether Suzuki was qualified to perform the essential duties of an ACO IV with or without reasonable accommodation.

▮ An employer is not required to exempt an employee from performing the essential functions of his or her job or to reallocate essential functions to other employees. *Phelps v. Optima Health, Inc.,* 251 F.3d 21, 26 (1st Cir.2001). Hawaii Administrative Rules (HAR) § 12–46–182 defines the term "essential functions" as follows:

"**Essential functions**" means:

(1) The fundamental job duties of the employment position the person with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) In determining whether a job function is essential, the focus should be on the purpose and importance of the function as it relates to the result to be accomplished, rather than on the manner in which the function is presently performed. Although it may be essential that a certain function be performed, often it is not essential that it be performed in a particular way, as long as the same result is achieved.

(3) A job function may be considered essential for any of several reasons, including, but not limited to, the following:

(A) The function may be essential because the reason the position exists is to perform that function;

(B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; or

(C) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(4) Evidence of whether a particular function is essential should reflect the actual functioning and circumstances of the particular job. Factors to be considered include, but are not limited to:

(A) The employer's judgment as to which functions are essential;

(B) Written job descriptions prepared before advertising or interviewing applicants for the job;

(C) The amount of time spent on the job performing the function;

(D) The consequences of not requiring the incumbent to perform the function;

(E) The terms of a collective bargaining agreement;

(F) The work experience of past incumbents in the job; or

(G) The current work experience of incumbents in similar jobs.

The employee has the burden of showing that he or she can perform the essential functions of the position with or without reasonable accommodation. *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996).

▮ In support of its motion for summary judgment, the State presented compelling evidence that due to Suzuki's physical limitations, she was not qualified to perform the essential functions of an ACO IV. The DPS's position description for an ACO IV, which its personnel officer confirmed was accurate, provides that an ACO IV must be able to lift and carry 90 pounds, bend, crawl, kneel, crouch, squat, and twist, among other things. The position description states that all ACOs are required to respond to emergency situations, including natural disasters, riots, inmate altercations, and escape attempts. It also notes that an ACO IV is assigned to a post for a period of three months, can bid for a shift based on seniority, and may be as-

signed to a number of different posts with different duties.

Larry Patterson, the Security Coordinator for the DPS, stated that the essential function of a correctional officer assigned to a residential module is to supervise and monitor inmates. This involves participation in routine activities such as inmate searches and inspection of inmate cells and responding to emergencies such as riots, inmate altercations, and escape attempts. Patterson stated that a person who is not physically able to participate in these activities is not qualified to serve as a correctional officer.

Finally, Dr. Shon, Suzuki's treating physician, found that Suzuki had severe physical limitations which would make it difficult for Suzuki to lift more than ten pounds, walk more than 100 steps without resting, climb more than two flights of stairs a day, or run. Dr. Shon concluded that as a result of Suzuki's physical limitations, Suzuki would not be able to return to her duties as an ACO.

Suzuki does not contest Dr. Shon's evaluation of Suzuki's physical limitations. However, in response to the State's motion for summary judgment, Suzuki submitted a declaration disputing that her physical limitations prevented her from performing the essential functions of her job. In particular, Suzuki asserted that the more physical aspects of the duties performed by ACOs, including inmate contact, were performed by ACO IIIs. She also indicated that as an ACO IV, it was not necessary for her to have contact with inmates and that the physical activities Dr. Shon found Suzuki was unable to perform were not part of her normal duties.

We conclude that Suzuki could not perform the essential functions of the ACO IV position and that she failed to demonstrate that there was a genuine issue of material fact on this issue. Courts from other jurisdictions have held that "the ability to perform a wide range of duties—most of which involve direct inmate contact—is an essential function of a corrections officer position." *Kees v. Wallenstein,* 973 F.Supp. 1191, 1194 (W.D.Wash. 1997), *aff'd,* 161 F.3d 1196 (9th Cir.1998); *see Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 484–85 (7th Cir.1997); *Martin v.*

*Kansas,* 190 F.3d 1120, 1130–32 (10th Cir. 1999), *overruled on other grounds by Bd. of Trs. of Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). A correctional officer who is physically unable to have direct contact with inmates cannot respond to emergencies when necessary. *Kees,* 973 F.Supp. at 1194. In *Miller,* 107 F.3d at 485, the court explained:

In the case of correctional officers and other paramilitary and military personnel, the reason for having [multiple] able workers who rotate through the different duty positions is to be able to respond to unexpected surges in the demand for particular abilities. The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability for such response. It would not do to have a correctional officer whose only experience and capability were in operating a telephone switchboard or issuing weapons. All this is obvious enough. . . .

Suzuki's claim that she was not required to have inmate contact is belied by her own deposition testimony, which demonstrated that at times she worked alone while in charge of Module 11 at OCCC:

Q. What were your duties there [in Module 11]?

A. To the custody and control of all of the inmates and their activities, which meant if they had to go to the medical unit, appointments for the psychiatrist, whatever needed to be done on a daily basis, and taking care of their food and clothing, and keeping them quiet and not fighting. That's what I did.

Q. When you say that's what I did, did you do that personally or did you have subordinates because you were a sergeant?

A. I had one person that would help me. But at times I worked alone.

More importantly, although Suzuki asserted that her normal duties as an ACO IV did not involve inmate contact, she did not come forward with specific facts to rebut the State's showing that an essential function of her job was the ability to deal with inmates in an emergency, such as during a prison riot, inmate altercations, or escape attempts. In addition, Suzuki's assertion that there were particular posts an ACO IV could hold that were not physically demanding did not create a genuine issue of fact as to her ability to perform the essential duties of her position. The State is not required to set the physical requirements for an ACO IV based on the least demanding post. *See Martin,* 190 F.3d at 1132. The ACO IV position description provided that an ACO IV is assigned a position for three months and may be assigned to a variety of different posts. Clearly, the State has a legitimate interest in requiring that an ACO IV be capable of performing a range of duties at a variety of posts, including posts requiring direct inmate contact. *Id.* The State also has a legitimate interest in requiring that an ACO IV be physically able to respond in an emergency to provide safety and security for prison employees, inmates, and the public.

Suzuki's disability prevented her from being qualified to perform the essential functions of the ACO IV position, with or without reasonable accommodation. She therefore failed to establish a prima facie case that she lost her ACO IV position due to disability discrimination. Because she could not show that she was qualified for the ACO IV position, Suzuki also failed to establish a prima facie case that she lost her ACO IV position due to race or gender discrimination under HRS § 378-2. To establish a prima facie case of race or gender discrimination with respect to her removal from the ACO IV position, Suzuki was required to demonstrate that she was qualified for that position. *Shoppe v. Gucci America, Inc.,* 94 Hawai'i 368, 378, 14 P.3d 1049, 1059 (2000). Accordingly, the State was entitled to summary judgment with respect to Suzuki's claims that the State discriminated against her on the basis of disability, race, and gender in precluding her from working as an ACO IV.

## B.

Suzuki argues that the State engaged in disability discrimination by failing to accommodate her disability by reassigning her to a light-duty position. Under HAR § 12–46–187(a),

[i]t is unlawful for an employer ... not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such employer ... can demonstrate that the accommodation would impose an undue hardship on the operation of its business.

*See also* ADA, 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include the failure to make reasonable accommodations). To be entitled to reasonable accommodation under HAR § 12–46–187, a person must be a "qualified applicant or employee with a disability." HAR § 12–46–182 defines the term "qualified person with a disability" as "a person with a disability who satisfies: (1)[t]he requisite skill, experience, education, and other job-related qualification standards of the employment position such person holds *or desires;* and (2)[w]ho, with or without reasonable accommodation, can perform the essential functions of such position." (Emphasis added.) *See also* 42 U.S.C. § 12111(8). A reasonable accommodation for a disability may include reassignment to a vacant position. HAR § 12–46–182; 29 C.F.R. § 1630.2(*o*)(2)(ii).

Thus, a disabled employee who cannot perform the essential functions of her existing job may be entitled to the reasonable accommodation of reassignment to a vacant job for which she can perform the essential functions. *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 677–79 (7th Cir.1998); *Huber v. Wal–Mart Stores, Inc.,* 486 F.3d 480, 482 (8th Cir.2007). However, in fulfilling its duty of reasonable accommodation, an employer is not required to create a new position, remove an existing employee, violate legitimate nondiscriminatory company policies, promote the employee to a higher level position, or endure an undue hardship. *See Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1174–78 (10th Cir.1999) (en banc);

*Martin,* 190 F.3d at 1133; *Dalton,* 141 F.3d at 677–80; *E.E.O.C. v. Humiston–Keeling, Inc.,* 227 F.3d 1024, 1028–29 (7th. Cir.2000). The employee bears the burden of showing that a vacant position exists. *Phelps,* 251 F.3d at 27; *see Dargis,* 526 F.3d at 988.

■ Here, the only vacant light-duty position identified by Suzuki was the receptionist position that was filled by Maglinti. However, Suzuki asserts that Maglinti was also disabled. Thus, the placement of Maglinti in the vacant light-duty receptionist position does not support Suzuki's claim of disability discrimination. Accordingly, the State was entitled to summary judgment on Suzuki's claim that the State discriminated against her on the basis of disability by failing to reassign her to a vacant light-duty position.

### C.

Suzuki also claims that the State discriminated against her on the basis of race and gender in not providing her with a light-duty job because it permitted other disabled ACOs, who were not African–American or female, to return to work in light-duty jobs.

■ In employment discrimination cases, in which the plaintiff attempts to prove disparate treatment by circumstantial evidence, Hawai'i courts have adopted the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Shoppe,* 94 Hawai'i at 378, 14 P.3d at 1059. Under the three-step *McDonnell Douglas* analysis, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Shoppe,* 94 Hawai'i at 378, 14 P.3d at 1059. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* "The employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action." *Id.* If the employer rebuts the plaintiff's prima facie case, the burden shifts back to the plaintiff to demonstrate that the employer's articulated

reasons were pretextual. *Id.* at 379, 14 P.3d at 1060. The burden of persuasion remains at all times with the plaintiff. *Id.*

To establish a prima facie case of race or gender discrimination based upon the State's refusal to provide her with light-duty work, Suzuki must show that: 1) she is a member of a protected class; 2) she applied for and was denied reassignment to light-duty work that she was capable of performing; and 3) similarly situated employees outside the protected class were granted reassignment to light-duty work. *See Beck v. City of Durham,* 129 F.Supp.2d 844, 854 (M.D.N.C.2000); *Blair v. Colonnas Shipyard Inc.,* 52 F.Supp.2d 687, 695 (E.D.Va.1999).

■ Suzuki made a prima facie showing of race and gender discrimination with respect to her light-duty claim. When viewed in the light most favorable to Suzuki, the evidence presented showed that Suzuki was a member of a protected class based on race and gender; that she was cleared by her doctor to work full time in a position "that did not require heavy lifting, bending, stooping, crawling, walking or standing for extended periods of time"; and that she had requested but was denied light-duty work. Suzuki also presented evidence that disabled non-African-American male ACOs, several of whom she identified by name, were permitted to return to work in light-duty jobs when they could no longer perform their normal duties and that Maglinti, a non-African-American, was chosen instead of Suzuki for the vacant light-duty receptionist position.

In response, the State cited its policy of reserving temporary light-duty reassignments for employees who are disabled by injuries compensable under the workers' compensation law as a legitimate, non-discriminatory reason for failing to reassign Suzuki to a light-duty position. However, the State did not offer evidence that it only granted light-duty work pursuant to the proffered policy. Nor did the State offer evidence that the individuals whom Suzuki named as being favored with light-duty reassignments had in fact been reassigned pursuant to the State's policy. Our review of the record shows that Maglinti did not fall within the policy because she sustained a non-work-

related disability. Thus, the policy does not provide a legitimate, non-discriminatory reason for the selection of Maglinti instead of Suzuki for the available receptionist position. The State did not offer an explanation for why Maglinti was selected instead of Suzuki.

In addition, Suzuki's ability to oppose the State's motion for summary judgment on her light-duty claim was hampered by the circuit court's blanket denial of her motion to compel the production of personnel files of other ACOs given light-duty work by the DPS and by the court's refusal to disclose any portion of Maglinti's personnel file after its in camera review. As we discuss *infra*, the court erred in these rulings because there was sufficient evidence in the record to show that Suzuki's request for these documents was reasonably calculated to lead to the discovery of admissible evidence with respect to her claims of race and gender discrimination in the State's refusal to provide her with light-duty work.

Under these circumstances, we conclude that the circuit court erred in granting summary judgment on Suzuki's claims that the State discriminated against her on the basis of race and gender by failing to reassign her to light-duty work.

### III.

Suzuki's brief contains long block quotations from two cases which discuss retaliation claims. However, Suzuki does not relate the cited cases to the facts of her case, and her brief does not contain any discernable argument on why the circuit court erred in granting summary judgment on her retaliation claim. This court need not address issues for which the appellant has failed to present a discernable argument. HRAP Rule 28(b)(7) ("Points not argued may be deemed waived."); *Hawaii Ventures, LLC v. Otaka, Inc.*, 114 Hawai'i 438, 478–79, 164 P.3d 696, 736–37 (2007); *Bocalbos v. Kapiolani Medical Ctr. for Women & Children*, 93 Hawai'i 116, 125 n. 25, 997 P.2d 42, 51 n. 25 (App. 2000).

In any event, we conclude that Suzuki did not present a prima facie case of retaliation. In order to establish a prima facie case of retaliation, Suzuki must show that: (1) she (a) has opposed any practice forbidden by HRS Chapter 378, Part I (entitled "Discriminatory Practices"), or (b) "has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under" HRS Chapter 378, Part I; (2) the State thereafter discharged, expelled, or otherwise discriminated against her; and (3) a causal link existed between the protected activity and the adverse employment action. *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 426, 32 P.3d 52, 70 (2001).

The only protected activity that Suzuki alleged in her complaint was her filing of "a claim alleging discrimination occurring at work against the State in 1985." This was fifteen years before the adverse employment action in this case.

We conclude that the span of time between Suzuki's 1985 discrimination complaint and the adverse employment action in this case is simply too long to permit a causal connection to be inferred between the protected activity and the adverse employment action. Causation in retaliation cases "can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir.2002); *see Schefke*, 96 Hawai'i at 425, 32 P.3d at 69 (stating that in construing the prohibition against retaliation under HRS § 378–2, we may look for guidance to federal case law interpreting the analogous provisions of Title VII of the Civil Rights Act of 1964). "[C]ourts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length." *Broderick v. Donaldson*, 338 F.Supp.2d 30, 38 (D.D.C. 2004) (internal quotation marks and citation omitted). Courts outside Hawai'i have relied upon time lapses far shorter than fifteen years in rejecting the inference of causation. *Villiarimo*, 281 F.3d at 1065 (holding that "[a] nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation"); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (holding that

a thirteen-month interval between the discrimination charge and termination was too long to establish causation absent other evidence of retaliation).

■ In her declaration, Suzuki also alleged retaliation on the part of her supervisor, May Andrade. Suzuki claimed that Andrade barred Suzuki from working as an ACO IV after Suzuki filed union grievances against Andrade for refusing to grant Suzuki's request to be excused from firearms qualification because of residual weakness from Suzuki's stroke. However, the record shows that the initial grievance Suzuki filed against Andrade in August 2000 did not allege disability discrimination but only claimed that firearms qualification was a waste of time and money because ACO IVs are not required to use firearms. The subsequent grievance Suzuki filed in October 2000, after she was barred from work, claimed that she was being retaliated against for filing a grievance which opposed the requirement that supervisors (like Suzuki) must qualify with firearms. It is not apparent from the union grievances Suzuki filed that she was claiming that she was discriminated against on the basis of her disability. In addition, Andrade testified in her deposition that she had no knowledge of the grievances filed against her by Suzuki. Under these circumstances, the evidence of Suzuki's grievances against Andrade did not support a prima facie case of retaliation.

## IV.

■ Suzuki did not identify the circuit court's grant of summary judgment on her claims for negligence, negligent hiring and retention, and infliction of emotional distress in her points of error in her brief as required by HRAP Rule 28(b)(4). She also did not present discernible argument with respect to the circuit court's grant of summary judgment on these claims as required by HRAP Rule 28(b)(7). We therefore deem Suzuki to have waived any challenge to the circuit court's grant of summary judgment on these claims. *See* HRAP Rule 28(b)(4) ("Points [of error] not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice plain

error not presented."); HRAP Rule 28(b)(7) ("Points not argued may be deemed waived."); *Hawaii Ventures,* 114 Hawai'i at 478–79, 164 P.3d at 736–37 (stating that "an appellate court is not obliged to address matters for which the appellant has failed to present discernable arguments"); *Ala Moana Boat Owners' Ass'n v. State,* 50 Haw. 156, 158, 434 P.2d 516, 518 (1967) (stating that "generalities and assertions amounting to mere conclusions of law" in a brief are insufficient to require the court's attention).

## V.

Suzuki argues that the circuit court erred by denying her motion to compel the production of documents. Suzuki filed a motion to compel the production of the following documents: 1) the personnel files of similarly situated ACOs who suffered strokes; 2) the personnel files of the three other ACOs, Maglinti, Vea, and Cunningham, who were locked out of OCCC at the same time that Suzuki was removed from her job; 3) pay records of Maglinti, Cunningham, and Vea; 4) the entire personnel files of all ACOs given light duty by the DPS from 1980 through 2003; 5) a copy of the personnel files and medical records of Patrick Fernandez; and 6) all ACO agility test scores for 1993 through 2003. The circuit court denied Suzuki's motion, except that it ordered that the personnel files of Cunningham, Fernandez, Maglinti, and Vea be produced for the court's in camera review.

■ Although the 23–year time span for the request for personnel files of ACOs given light duty was excessive, the DPS's practice of providing light duty to injured ACOs appears to be directly relevant to Suzuki's claim of disparate treatment on the basis of race and gender in the State's failure to reassign her to a light-duty position. *See French,* 105 Hawai'i at 477–78, 99 P.3d at 1061–62. The circuit court should have required the State to produce, at least for an in camera review, the personnel files of ACOs who were granted light-duty work within a reasonable range of time from Suzuki's removal from her ACO IV position. We conclude that the circuit court abused its

discretion in its blanket refusal to compel production of the personnel files of ACO's given light duty. *See id.*

We remand the case for further review by the circuit court of Suzuki's motion to compel production of the personnel files of all ACOs given light duty by the DPS. The circuit court shall determine a reasonable. range of time for Suzuki's request for these personnel files. It shall order the State to produce portions of these personnel files within the determined range of time that show the circumstances surrounding and the basis on which the ACO was granted light-duty work, unless the State demonstrates and the circuit court confirms through in camera review that the documents relating to a particular ACO are not discoverable. The court may permit redactions of documents where appropriate and impose other reasonable conditions on the disclosure of the documents. *See id.* at 478, 99 P.3d at 1062.

■ We conclude that the circuit court did not abuse its discretion in denying Suzuki's motion to compel the production of personnel files of ACOs who suffered strokes and ACO agility test scores. With respect to the personnel files that the circuit court reviewed in camera, we conclude that the circuit court did not abuse its discretion in denying Suzuki's motion to compel production of the personnel files of Cunningham, Fernandez, and Vea. Our review of those files did not reveal evidence that would support Suzuki's disparate treatment claim—all three individuals ended up resigning. However, we conclude that the circuit court erred in refusing to compel production of any portion of Maglinti's personnel file.

■ The record indicates that Maglinti was a non-African-American woman who, like Suzuki, was removed from her ACO position based on a non-work-related disability. Maglinti was selected over Suzuki for the vacant receptionist position. We conclude that .the portions of Maglinti's personnel file relating to Maglinti's qualifications and selection for the receptionist position were discoverable with respect to Suzuki's claim of race discrimination. Accordingly, the circuit court erred in failing to compel production of those portions of Maglinti's file.

## CONCLUSION

We affirm the circuit court's February 15, 2005, Judgment, except that we vacate the Judgment to the extent that it entered judgment in favor of the State on Suzuki's claims that the State discriminated against her on the basis of race and gender in failing to reassign her to a light-duty position. We also affirm in part and vacate in part the circuit court's order filed on January 10, 2005, which set forth its ruling on Suzuki's motion to compel production of documents. We remand the case for further proceedings consistent with this opinion.

